OPINION
{¶ 1} Joseph Koncelik, Director of Environmental Protection ("Ohio EPA"), appeals from an order of the Environmental Review Appeals Commission ("ERAC"), in which it found restrictions placed in an operating permit for General Electric Lighting ("GEL") were unreasonable. GEL also appeals ERAC's order that denied its motion for summary judgment and ERAC's order that denied its motion to place the burden of proof and burden of proceeding on Ohio EPA.
 {¶ 2} As detailed below, Title V is a portion of the federal Clean Air Act, 42 U.S. Code 7661-7661f ("CAA" or "Act"), that establishes a program for the issuance of operating permits to certain individual sources of air pollutants. R.C. 3704.036
authorizes Ohio EPA to issue Title V permits for sources located in Ohio.
 {¶ 3} GEL operates a lime glass-melting furnace in Logan, Ohio. GEL applied for a Title V permit in June 1996, and, on September 26, 2001, Ohio EPA issued a Title V permit to GEL. In addition to other restrictions, the permit required GEL to operate its electrostatic precipitator ("ESP") on a glass-production furnace within the range of 13 to 25 kilovolts for the secondary voltage and 21 to 60 milliamps for the secondary current. The ESP controls the emission of particulate matter from the glass-production furnace by using voltage and current to create electric fields in three groups of plates and needles. Each group of plates and needles is a "field" and collects particulate matter from flue gas as it passes through the plates and needles. A later modification of the present permit allowed the first field to operate at a minimum of 7 milliamps and the second and third fields to operate at a minimum of 16.5 milliamps. The permit indicated that the operation of the ESP outside the assigned parameters was a violation, even if the particulate emissions were under 0.2 pounds of emissions per ton of glass produced, which is the limit prescribed in federal regulations. The ESP requirement was in a section of the permit that was federally enforceable by the United States Environmental Protection Agency ("U.S. EPA"), and violations of the requirement could result in daily penalties of approximately $30,000. Ohio EPA asserts that this requirement is a more economical alternative to increasing the testing of the actual emissions from the furnace using a "stack test," each of which costs approximately $10,000 per test. Stack tests are typically performed at least once every three years.
 {¶ 4} On October 23, 2001, GEL appealed the permit to ERAC. On November 12, 2002, Ohio EPA filed a motion for partial summary judgment. On November 27, 2002, GEL moved for summary judgment. One of the grounds in GEL's motion, as pertinent to GEL's present appeal, was that the voltage and current conditions were unlawful because they violated R.C. 3704.036(K)'s prohibition against including any "new substantive requirements" in the federally enforceable portion of a Title V permit.
 {¶ 5} On August 21, 2003, ERAC ruled on the parties' motions for summary judgment. As pertinent to this appeal, ERAC denied the portion of GEL's motion and granted the portion of Ohio EPA's motion for summary judgment that addressed the issue of the ESP parameters. ERAC found that Ohio EPA's actions were lawful with regard to the setting of the ESP parameters because Ohio Adm. Code3745-77-07(A)(1) requires Title V permits to contain operational requirements and emission limitations that assure compliance with all applicable requirements at the time of issuance. ERAC ordered the parties to proceed to a de novo hearing regarding the reasonableness of the operational restrictions in the Title V permit.
 {¶ 6} On November 3, 2003, GEL filed a motion for an order placing the burden of proof and burden of proceeding on Ohio EPA regarding the reasonableness of the operational restrictions on ESP voltage and current. On December 3, 2003, ERAC granted GEL's motion in part, finding that Ohio EPA had the burden of proceeding with evidence, but denied it insofar as it found GEL had the burden of proving that the operational restrictions were not reasonable.
 {¶ 7} As a result of settlement negotiations, Ohio EPA and GEL resolved all of the issues pertinent to the pending ERAC appeal except for the reasonableness of the operational restriction related to the power input (voltage and current together) requirements for the ESP. ERAC held a hearing on March 30 and 31, 2004, and thereafter ERAC issued an order finding that, although the permit and the operational restrictions therein were lawful, the restrictions prescribing the power input parameters on GEL's ESP were unreasonable. Ohio EPA has appealed to this court ERAC's final order, and GEL has appealed ERAC's pre-hearing orders in which it denied GEL summary judgment and found it had the burden of proof at the hearing de novo.
 {¶ 8} GEL asserts the following assignments of error:
1. The Environmental Review Appeals Commission erred in its denial of Appellant General Electric Lighting's motion for summary judgment on the ground that restrictions on the operation of an air pollution control device initially imposed by the Director of Environmental Protection in a Title V permit to operate are not new substantive requirements prohibited by O.R.C. Section 3704.036(K).
2. The Environmental Review Appeals Commission erred in ruling in a prehearing order that Appellant General Electric Lighting has the burden of proving at the hearing de novo that restrictions on the operation of an air pollution control device introduced by the Director of Environmental Protection in a Title V permit to operate are unlawful or unreasonable.
 {¶ 9} Ohio EPA asserts the following assignment of error:
The Director had a valid factual foundation for requiring GE to properly operate its pollution control equipment; therefore, ERAC erred by eliminating the operational restriction that required proper operation.
 {¶ 10} In reviewing ERAC orders, this court is guided by the standard contained in R.C. 3745.06. R.C. 3745.06 indicates this court "shall affirm the order" if we find "upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." "In the absence of such a finding," the court "shall reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." Id. Reliable evidence is evidence that can be trusted. Our Place, Inc. v. Ohio Liquor Control Comm.
(1992), 63 Ohio St.3d 570, 571. In order for evidence to be reliable, there must be a reasonable probability that it is true. Id. Probative evidence is evidence that tends to prove the issue in question, while substantial evidence is evidence that carries weight, or evidence that has importance and value. Id.
 {¶ 11} Ohio EPA argues that we should begin our analysis with the question of whether the restrictions are reasonable. If we affirm ERAC's finding that they are unreasonable, EPA continues, then we need not reach the question of whether they are unlawful. We find, however, that even if we find that the restrictions at issue here are unreasonable because the evidence does not support them, there would still exist a controversy between the parties as to whether the operational restrictions are unlawful because they are new substantive requirements. See Grove City v. Clark,
Franklin App. No. 01AP-1369, 2002-Ohio-4549, quoting Culver v.City of Warren (1948), 84 Ohio App. 373, 393 (describing moot actions as those that "`involve no actual genuine, live controversy, the decision of which can definitely affect existing legal relations'"). Therefore, we begin our analysis with GEL's first assignment of error, in which it asserts that ERAC erred when it failed to grant summary judgment on GEL's asserted grounds that the operational restrictions on the ESP are "new substantive requirements" and, therefore, are prohibited under R.C. 3704.036. Stated another way, GEL argues that the operational restrictions are unlawful. For the following reasons, we agree.
 {¶ 12} On November 15, 1990, Congress amended the federal CAA to include in Title V of the Act a program for the issuance of operating permits to certain sources of air pollution, thus altering the method by which state and federal governments regulate these sources. Under this program, typically, as is the case in Ohio, the federal government delegates to a state its authority to require entities within that state to comply with federal air pollution standards. In general terms, the state incorporates federal standards into a state plan and receives approval of the state plan from U.S. EPA, and then the state issues a "Title V permit" to a particular source and the applicable standards become federally enforceable terms and conditions of that permit.
 {¶ 13} R.C. 3704.036 is the Title V implementing statute for the state of Ohio. R.C. 3704.036(A) directed Ohio EPA to "develop and administer a federally approvable Title V permit program" for certain sources of air pollution. R.C. 3704.036(A) further provides:
Federally enforceable requirements shall be identified separately in Title V permits. The director may include in those permits reasonable and lawful terms and conditions necessary to ensure compliance with this chapter and rules adopted under it that are not federally enforceable requirements, provided that those terms and conditions are clearly separated from federally enforceable requirements and the Title V permits state that those terms and conditions are not federally enforceable.
 {¶ 14} In addition, R.C. 3704.036(K) provides:
A Title V permit shall address all existing federally enforceable requirements applicable to the permitted facility andshall not impose new substantive requirements beyond thefederally enforceable requirements except for terms and conditions that are identified as not federally enforceable as provided in division (A) of this section. A Title V permit shall specify the regulatory citation for federal requirements addressed in the permit and shall identify any difference in form as compared to the federally enforceable requirement on which it is based.
(Emphasis added.)
 {¶ 15} GEL offers both dictionary and common law definitions for its assertion that the operational restrictions imposed on the ESP through the Title V permit are "new substantive requirements," and, therefore, R.C. 3704.036(K) prohibits them. In response, Ohio EPA focuses on the words "beyond those federally enforceable requirements" to argue that the restrictions are lawful.
 {¶ 16} First, Ohio EPA asserts that Ohio's Title V program must track federal requirements, and we agree. R.C. 3704.036(B) required Ohio EPA to adopt program rules "that are consistent with, and no more stringent than," federal requirements. And, R.C. 3704.01(T) expressly provides that, if a term is defined in federal regulations, then it has the same meaning under the Ohio program.
 {¶ 17} Second, Ohio EPA looks to section 504 of the CAA,42 U.S.C.S. § 7661c, which provides that permits "shall include * * * such other conditions as are necessary to assure compliance[.]" Federal regulations, in turn, provide that permits shall include "operational requirements and limitations that assure compliance with all applicable requirements at the time of permit issuance." Section 70.6(a)(1), Title 40, C.F.R. Consistent with this federal language, Ohio EPA promulgated Ohio Adm. Code 3745-77-07(A)(1), which provides that a "permit shall include emission limitations and standards, including those operational requirements and limitations that assure compliance with all applicable requirements at the time of issuance." If the operational restrictions "assure compliance with all applicable requirements" (a question we consider below), Ohio EPA argues, they are not unlawful. We find, however, that Ohio EPA's reading of the applicable laws and regulations — a reading shared by ERAC — ignores R.C. 3704.036(K).
 {¶ 18} In construing R.C. 3704.036(K), we begin with the principle that, "[w]here the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is to be applied, not interpreted." Sears v.Weimer (1944), 143 Ohio St. 312, paragraph five of the syllabus. Thus, "[i]t is only where the words of a statute are ambiguous or are based upon an uncertain meaning or there is an apparent conflict of some provisions that a court has the right to interpret a statute." Drake-Lassie v. State Farm Ins. Cos.
(1998), 129 Ohio App.3d 781, 788, citing Kroff v. Amrhein
(1916), 94 Ohio St. 282, and R.C. 1.49.
 {¶ 19} Taken as a whole, R.C. 3704.036(K) requires each Title V permit to address all existing and applicable federally enforceable requirements. R.C. 3704.036(K) prohibits a Title V permit from imposing and enforcing under federal law any new substantive requirements beyond those that are already existing and applicable under federal law. (In this respect, Ohio EPA's attempt to delete the word "those" from the phrase "beyond those federal requirements" is unavailing.) Thus, a Title V permit can: (1) incorporate existing substantive federally enforceable requirements; (2) incorporate new non-substantive federally enforceable requirements; or (3) impose new substantive requirements under state law, as long as those terms and conditions are separately identified as not enforceable under federal law. What remains for us to determine, then, is whether the operational restrictions are "new substantive requirements."
 {¶ 20} Here, while Ohio EPA argues that the operational restrictions are "existing" under federal law because they assure compliance, neither party disputes ERAC's finding that these specific operational restrictions have not been imposed upon, nor held applicable to, GEL before. Therefore, they are "new." Nor can either party reasonably dispute ERAC's finding that they are "requirements" as the permit clearly demands that GEL comply with them. Therefore, the issue before us is whether the restrictions are "substantive."
 {¶ 21} In common usage, "substantive" means "creating and defining rights and duties" or "having substance: involving matters of major or practical importance to all concerned[.]" Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) 1245. A substantive law is the "part of the law that creates, defines, and regulates the rights, duties, and powers of parties." Black's Law Dictionary (7th Ed. 1999) 1443.
 {¶ 22} In State v. Cook (1998), 83 Ohio St.3d 404, certiorari denied (1999), 525 U.S. 1182, in determining whether Ohio's sex offender registration statute was an unconstitutional retroactive law, the Ohio Supreme Court considered whether the statute was substantive or remedial. The court stated: "A statute is `substantive' if it impairs or takes away vested rights, affects an accrued substantive right, imposes new or additional burdens, duties, obligation, or liabilities as to a past transaction, or creates a new right." Cook at 411, citing VanFossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 107. See, also, Amoco Oil Co. v. Petroleum Underground Storage TankRelease Comp. Bd. (2000), 89 Ohio St.3d 477, 484 (distinguishing between substantive and procedural rights and holding that an administrative rule imposing a time limit for action is procedural, not substantive).
 {¶ 23} Applying these definitions to R.C. 3704.036(K), we can only conclude that the operational restrictions are substantive. First, they create and define a duty imposed on GEL under the permit, as they govern the conditions under which the ESP may operate. Second, they create a liability upon GEL, as failure to adhere to these restrictions constitutes a violation of the permit and subjects GEL to federal penalties. Third, they define the terms under which EPA or a citizen may bring legal action to enforce the permit. Thus, the operational restrictions are substantive requirements.
 {¶ 24} Moreover, even if we were to conclude that R.C.3704.036(K) is ambiguous and, therefore, subject to the rules of statutory interpretation, we would still find that the operational restrictions are substantive. In determining the intent of the legislature, we may consider: "(A) The object sought to be attained; (B) The circumstances under which the statute was enacted; (C) The legislative history; (D) The common law or former statutory provisions, including laws upon the same or similar subjects; (E) The consequences of a particular construction; [and] (F) The administrative construction of the statute." R.C. 1.49.
 {¶ 25} In Sandusky Dock Corp. v. Jones, 106 Ohio St.3d 274,2005-Ohio-4982, the Ohio Supreme Court acknowledged two potentially conflicting rules of statutory interpretation applicable here. The court stated:
* * * First, we will give due deference to the director's "reasonable interpretation of the legislative scheme" governing his agency. Northwestern Ohio Bldg. Constr. Trades Council v.Conrad (2001), 92 Ohio St.3d 282, 287, 750 N.E.2d 130. Second, "any uncertainty with regard to the interpretation of R.C. Chapter 3704 and rules promulgated thereunder should be construed in favor of the person or entity (manufacturer or otherwise) affected by the law." State ex rel. Celebrezze v. Natl. Lime Stone Co. (1994), 68 Ohio St.3d 377, 385, 627 N.E.2d 538.
Id. at ¶ 8. Using these same principles as our guide, we consider R.C. 3704.036(K).
 {¶ 26} The language of R.C. 3704.036(K) is best understood in the context of Congress's purposes for adding the Title V program. That purpose was to "generally clarify, in a single document, which requirements apply to a source and, thus, * * * enhance compliance with the requirements of the Act."57 Fed.Reg. 32250 (July 21, 1992). Prior to that time, a source's obligations under the Act were scattered among many provisions of state and federal law. With the advent of a single document, that is, a single operating permit for a source of air pollution, "[t]he title V permit program * * * enabl[ed] the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements. Increased source accountability and better enforcement should result." Id.
 {¶ 27} Thus, it was not the purpose of Title V to impose new requirements on air sources. As U.S. EPA stated: "While title V generally does not impose substantive new requirements, it does require that fees be imposed on sources and that certain procedural measures be followed, especially with respect to determining compliance with underlying applicable requirements." Id.; see, also, Section 70.1(b), Title 40, C.F.R. ("[w]hile title V does not impose substantive new requirements, it does require that fees be imposed on sources and that certain procedural
measures be adopted especially with respect to compliance"). (Emphasis added.)
 {¶ 28} The United States Court of Appeals for the D.C. Circuit ("no novice with respect to reviewing agency interpretations," United States v. American Natl. Can Co.
[2000], 126 F.Supp.2d 521, 530) has stated that monitoring requirements imposed on an air source through a Title V permit are "new substantive requirements." In Appalachian Power Co. v.EPA (C.A.D.C. 2000), 208 F.3d 1015, the court considered whether provisions contained within a guidance document issued by U.S. EPA should have been subject to rulemaking procedures under the CAA. The court found that the provisions reflected a settled agency position that had legal consequences for states and regulated entities and, therefore, should have been subject to rulemaking. The court also stated:
Furthermore, we attach significance to EPA's recognition, in its 1992 permit regulations, that "Title V does not impose substantive new requirements," * * *. Test methods and the frequency of testing for compliance with emission limitations are surely "substantive" requirements; they impose duties and obligations on those who are regulated. * * * We have recognized before that changing the method of measuring compliance with an emission limitation can affect the stringency of the limitation itself. * * * In addition, monitoring imposes costs. Petitioners represent that a single stack test can "cost tens of thousands of dollars, and take a day or more to complete," which is why "stack testing is limited to once or twice a year (at most)." * * * If a State agency, acting under EPA's direction in the Guidance, devised a permit condition increasing a company's stack test obligation (as set forth in a State or federal standard) from once a year to once a month, no one could seriously maintain that this was something other than a substantive change.
Id. at 1026-1027.
 {¶ 29} Here, Ohio EPA argues that it imposed the operational restrictions as an alternative to the very method of monitoring cited by the D.C. Circuit, i.e., stack testing. Ohio EPA points to the substantial costs of stack testing and asserts that restricting the operation of the ESP is more cost effective than imposing additional monitoring. But, applying the D.C. Circuit's reasoning here, if Ohio EPA had imposed additional monitoring rather than operational restrictions, "no one could seriously maintain that this [would have been] something other than a substantive change." Id. at 1027.
 {¶ 30} Finally, we look to legal interpretations of the term "substantive" in contexts outside of Title V permitting. InAmerican Natl. Can at 530, the court found that U.S. EPA's interpretation of the term "renovation" to include unauthorized scavenging "broaden[ed] the scope of the asbestos [federal standard] in a substantive manner" without rulemaking. In Gen.Elec. Co. v. EPA (C.A.D.C. 2002), 290 F.3d 377, 385, the court found that a guidance document issued by U.S. EPA was a "legislative rule" subject to rulemaking, not merely an agency policy statement. In making that determination, the court looked to whether the document expressed a change in substantive law or policy, which the agency intends to make binding or administers with binding effect, and not an interpretation. And, inCovington v. Jefferson Cty. (C.A.9, 2004), 358 F.3d 626, the court found that Congress's amendments to federal waste laws were substantive because they prohibited certain wastes from disposal in landfills. The court stated: "If a statute proscribes conduct, then we consider it substantive, because it imposes a duty upon all not to engage in that conduct." Id. at 648. Cf. SBC Inc. v.FCC (C.A.3, 2005), 414 F.3d 486, 501 (finding that federal communications order was not a "legislative rule" because it did not modify or substantively change the agency's prior interpretation or impose new duties. The order "is, at most, interpretative. It simply clarified, and explained, an existing rule").
 {¶ 31} We acknowledge that these interpretations are neither binding upon us nor directly on point. The rationale underlying these decisions, however, is helpful to our analysis here as it aids our understanding of laws concerning similar subjects and what the term "substantive" is commonly understood to mean. Applying these interpretations here, we can readily conclude that the operational restrictions contained in the GEL permit go beyond policy statements or interpretations of existing rules, and they are not procedural. Rather, as we concluded above, they impose duties and obligations upon GEL and create legal liabilities. Therefore, they are substantive requirements.
 {¶ 32} In sum, we find that the operational restrictions imposed on the ESP through the Title V permit are new substantive requirements. Because R.C. 3704.036(K) provides that a Title V permit shall not impose new substantive requirements, they are unlawful. Therefore, ERAC erred when it denied GEL summary judgment on this point, and we sustain GEL's first assignment of error.
 {¶ 33} We turn now to Ohio EPA's assignment of error. Ohio EPA argues that it had a valid factual foundation for requiring GEL to properly operate its pollution control equipment; therefore, ERAC erred by eliminating the operational restrictions that required such proper operation. However, we find that, even if the operational restrictions are not new substantive requirements, they are unlawful and unreasonable because they do not assure compliance.
 {¶ 34} Ohio EPA presents two "issues" under its assignment of error, with multiple arguments under each issue. Ohio EPA's first issue is that ERAC ignored the standard of review established by the General Assembly and, instead, created a new standard that allowed it to substitute its judgment for that of Ohio EPA. Ohio EPA cites several authorities for ERAC's standard of review. R.C.3745.05 provides, in pertinent part:
If, upon completion of the hearing, the commission finds that the action appealed from was lawful and reasonable, it shall make a written order affirming the action, if the commission finds that the action was unreasonable or unlawful, it shall make a written order vacating or modifying the action appealed from. * * *
This standard does not allow ERAC to substitute its judgment for that of the director of Ohio EPA or to stand in the place of the director. CECOS Internatl., Inc. v. Shank (1992),79 Ohio App.3d 1, 6. The term "unreasonable" means that which is not in accordance with reason, or that which has no valid factual foundation. Citizens Committee v. Williams (1977),56 Ohio App.2d 61, 70. The issue is not whether the action is the best or most appropriate action or if ERAC would have taken the same action. Id.
 {¶ 35} Here, citing R.C. 3745.05, CECOS Internatl., andWilliams, Ohio EPA contends that ERAC substituted its judgment for Ohio EPA's and ignored the standard of review established by the General Assembly because it did not determine whether Ohio EPA's action had a valid factual foundation but, instead, created a new standard, indicating it would only approve operational restrictions if the restrictions had a "clear or direct correlation" to the emissions limit. Ohio EPA contends this standard amounts to requiring an absolute mathematical certainty, which is far more difficult to meet than the "reasonable basis" standard established by the General Assembly.
 {¶ 36} In its final order, ERAC found that the record failed to demonstrate the operational restrictions assured compliance with the applicable requirement for particulate emissions. ERAC stated that the testimony and evidence demonstrated that restricting power input to the ESP is only one of many factors that has an effect on ESP efficiency, and the expert testimony could not establish within a reasonable degree of scientific certainty what the particulate emissions would be if GEL operated the ESP above or below the ranges allowed by the permit. ERAC also found significant an incident described by a witness, wherein the company was forced to shut off one field of the ESP in order to comply with the operations restriction and not violate its permit, despite the fact that operating the ESP with only two of the three fields running decreased particulate removal. ERAC cited a graph and regression analysis using stack test figures that demonstrated there was no "direct correlation" between emissions and voltage or current and, thus, the prescribed power ranges did not "directly relate" to the enforceability of the particulate emissions.
 {¶ 37} We find ERAC used the proper standard of review and did not establish a stricter standard than required by statute and case law. We first note that ERAC never required a "clear or direct correlation." That phrase was used in a prior ERAC case quoted by ERAC in the present case. Here, ERAC used the terms "direct correlation" and "directly relate." We further note that ERAC recited the language in R.C. 3745.05, CECOS Internatl.,
and Williams, and, thus, was ostensibly aware of the proper standards.
 {¶ 38} Notwithstanding, as indicated above, in order for there to be a "reasonable basis" for Ohio EPA's action, Ohio EPA's action must have a "valid factual foundation." SeeWilliams. Further, Ohio Adm. Code 3745-77-07(A)(1) provides that each Title V permit must include emissions limitations, including those operational requirements that "assure compliance" with all applicable requirements at the time of issuance. Thus, Ohio EPA must have had a valid factual foundation for imposing the specific numerical limitations for voltage and amperage on GEL's ESP, and those limitations must assure compliance with emissions limitations.
 {¶ 39} Although Ohio EPA contends ERAC's requirement that there be a "direct correlation" between emissions and voltage or amperage is too stringent and not in accord with R.C. 3745.05 andWilliams, it is clear that, without valid factual evidence to support a "direct correlation" between emissions and voltage or amperage, Ohio EPA would not be able to assure compliance with the emissions requirements by merely prescribing power limitations. Ohio EPA must agree that, if there were zero relationship between emissions and the limitation of power input alone, the imposition of power limitations in a permit could not assure compliance with applicable law. At the other extreme, we do not read ERAC's order as requiring "absolute mathematical certainty" as to the incremental movements of emissions resulting from power input adjustments, contrary to Ohio EPA's claim. Rather, what ERAC seems to require is a correlation that is direct to the degree that the manipulation of the power input parameters alone, without regard to any other parameters, results in reasonably associated corresponding consequences to emissions. However, as ERAC found that manipulation of solely the power inputs resulted in not only unpredictable proportional changes to emissions, but also unpredictable overall directional changes to emissions, it could not find that imposing limitations solely on power inputs would assure compliance. The crux of this "direct correlation" requirement is that power input alone, without consideration of the other factors that affect emissions, must have a significant, foreseeable relationship to emissions in order for the limitation solely on power input to be based on a valid factual foundation. As Ohio Adm. Code 3745-77-07(A)(1) requires a restriction to assure compliance with emissions limitations, a restriction lacking a "direct correlation" to emissions cannot be based on a valid factual foundation. Thus, to the extent that ERAC defined a "valid factual foundation" to require a "direct correlation," we do not find ERAC erred in using the standards it did.
 {¶ 40} Having found that ERAC used the correct legal standards, we must now address whether it properly determined the merits of the case based upon those standards. Accordingly, the issue before us is whether ERAC's finding, that the operational restrictions did not assure compliance with the applicable requirements for particulate emissions, is supported by reliable, probative, and substantial evidence and is in accordance with law. Ohio EPA argues that its inclusion of the operational restrictions was supported by a valid factual foundation demonstrating that, when GE maintained voltage and current levels on its pollution control equipment within specified ranges, the company maintained compliance with its emissions limits. Ohio EPA asserts that the ranges were established using historical figures for voltage and current during stack tests that demonstrated GE's compliance with the underlying emissions limitations. Ohio EPA further maintains that voltage and amperage are clearly required to collect emissions, and voltage and amperage clearly affect emission collection efficiency. Ohio EPA chose to impose the operational voltage and amperage ranges because they represented the most economically reasonable method of achieving and assuring compliance.
 {¶ 41} ERAC held a hearing, which included evidence and witness testimony. Leslie Sparks, an engineer with the U.S. EPA who testified on behalf of Ohio EPA, testified that, when GEL's ESP operated within the permit ranges for voltage and amperage, GEL complied with the emissions requirements; thus, the operating restrictions were reasonable. However, on cross-examination, Sparks agreed that there are a number of factors that affect how well an ESP controls particulate emissions, including particle resistivity, particle size, rapping (the knocking of the collection plates to dislodge dust particles), frequency of the ESP plates, and the flow rate of the flue gas. He also stated that, if the kilovoltage level of the ESP were operated at 1/10 below the range allowed by the permit, he could not testify to a reasonable degree of scientific certainty that such would result in impermissible emissions. Sparks also stated that, if the ESP were operated at a milliamperage of 20 rather than the lowest permit level of 21, he could not testify to a reasonable degree of scientific certainty that such would result in impermissible emissions.
 {¶ 42} With regard to each of the three fields within the ESP, Sparks further testified that, if the first field were operated at six milliamps, or the second and third fields were operated at 15.5 milliamps, he could not testify to a reasonable degree of scientific certainty that the emissions would exceed the permit limitations. He also stated that, according to a stack test reported in 2000, GEL can still operate within the emissions limits if one field is turned off and the other two operate between 15 and 20 kilovolts. Sparks further admitted that, during prior stack tests, when all three fields were running within the operation restrictions, the average emission values were less than half the permitted emission level.
 {¶ 43} James Orlemann, the assistant chief in charge of the compliance and enforcement section of the Division of Air Pollution Control for Ohio EPA, testified that he was not an expert on ESPs, and he had not conducted any scientific studies on whether there is a positive correlation between kilovoltage and milliamperage in an ESP and the emissions coming from an ESP. He stated that, if the first field were operated at a level below the permit limits, he could not say what the emissions level would be. He said it was possible that, if the milliamperage in the fields were below what was allowed by the permit, the ESP would still comply with the emissions standard. He admitted that although the data showed that as voltage was decreased the emission rate increased, the data for milliamperage showed that sometimes when milliamperage went down emissions also went down, and when the milliamperage went up emissions also went up. Orlemann also testified that the 1993 Ohio EPA operation and maintenance guidelines for air pollution control equipment indicated that, under some circumstances, there is no relationship between power input into an ESP and the emissions being emitted from an ESP. These 1993 guidelines also stated that particle resistivity and the condition of the ESP equipment affect ESP performance.
 {¶ 44} In addition, Orlemann stated that, within a reasonable degree of scientific certainty, if GEL operated its ESP within the ranges in the permit, compliance with the emission limits could be assured. However, he could not testify that the relationship was such that a certain level of power would produce a certain level of emissions. Orlemann stated "there may be" such a relationship. He stated the relationship Ohio EPA was defining in the permit, however, was only that, if GEL operated within the specified ranges, then it could be assured that it will be in compliance with the emission limits. Orlemann then admitted that, in order to replicate any given emission rate, one would have to replicate not only the power input conditions, but all the other conditions that affect the emission rate from the ESP.
 {¶ 45} Christopher Parker, the global air leader for GEL at the time the permit was issued, testified to the following regarding a graph that plotted 10 prior stack test results: (1) comparing the first October 1985 test to the second March 1991 test, when milliamps and kilovolts went up, emissions went down; (2) comparing the second March 1991 test to the third October 1996 test, when milliamps and kilovolts went down, emissions went down; (3) comparing the June 1994 test and the October 1999 test, when kilovolts stayed the same and milliamps went up, emissions went down; and (4) comparing the October 1999 test to the June 1994 test, when kilovolts stayed the same and milliamps went down, emissions went down. Considering this data, Parker concluded that there was no relationship between milliamps or kilovolts and the emissions produced by the ESP.
 {¶ 46} Parker next testified regarding a regression analysis he completed on the stack test data. A regression analysis takes two sets of data and determines how related the two sets are to each other by assigning an "R" squared percentage. The higher the "R" squared percentage, the more the sets are correlated. An 80 percent or higher "R" squared percentage would indicate a significant relationship between milliamps or kilovolts and the percent of emissions limit reached. An "R" value below 80 percent would indicate kilovolt or milliamp levels could not be used to predict the emission rate. GEL presented eight graphs, which included a regression plot for each field separately using the 10 kilovolt levels from the 10 prior stack tests, for each field separately using the 10 milliamperage levels from the 10 prior stack tests, and for the average kilovolt and milliamperage levels for all fields from the 10 prior stack tests. Parker testified to, and the exhibits showed, the following: (1) the relationship between the kilovolt level and percent of emissions limit for field one was .6 percent; for field two 1.2 percent; and for field three 13.7 percent; (2) the relationship between the milliamperage level and percent of emissions limit for field one was 1.7 percent; for field two .9 percent; and for field three .9 percent; (3) the relationship between the average kilovolt level for all fields and percent of emissions limit was 4.2 percent; and (4) the relationship between the average milliamp level for all fields and percent of emissions limit was 1.2 percent. Based on this data, Parker concluded that there is "virtually" no relationship between kilovolts and milliamps and the actual emissions of particulate. He stated he could not say whether there was any particular range of kilovolt or milliamp levels for the ESP that would correspond to emissions of less than the permissible limits. Parker also testified that, at least once, one of the fields was going out of the range specified in the permit, so they turned that field off to avoid violating the permit condition, which increased emissions, although the ESP still stayed under the federal emission limits.
 {¶ 47} Kenneth Hrycik, a manager for a group that designs and repairs glass melting furnaces for General Electric worldwide, testified that many different factors affect the collection efficiency of an ESP, including the resistivity of the particles, the particle size, the volume of flue gas, the temperature of the flue gas, the temperature of the furnace, the "cullet [the amount of glass product not used and then recycled back into the furnace] ratio," and rapping frequency and intensity. Hrycik further testified that he does not believe one can correlate kilovolts or milliamps to emission from the furnace or predict what emissions will be if you know what the milliamps and kilovolts are, because the other factors also affect collection rate. Hrycik testified that the stack tests are generally performed at approximately 90 percent of maximum production. He also stated that, although the ESP has a dial to control kilovolts going into the ESP, there is no control over the milliamps, and GEL has no control over whether it stays within the milliamps range indicated in the permit. However, Hrycik admitted that one could not be 100 percent certain that the ESP was operating under the emissions limit between three-year stack tests because factors may change significantly in the operation of the furnace from the time of the last stack test. He did say that GEL can somewhat judge whether it is staying under the emission limits by examining the amount of particulate matter it collects. He also testified that GEL monitors the volume of the flue gas exiting the furnace by reading the oxygen levels within the flue gas and also monitors the temperature of the flue gas.
 {¶ 48} As stated above, R.C. 3745.06 indicates that this court "shall affirm the order" if we find "upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." After reviewing the testimony and evidence presented at the hearing before ERAC, we find that ERAC's order was supported by reliable, probative, and substantial evidence and was in accordance with law. We agree with Ohio EPA that, if GEL failed to operate the ESP at all or with only one field working, the ESP would exceed the emissions limitation. We also agree that voltage and amperage are clearly required to collect emissions and have some effect on emission collection efficiency. However, in order for Ohio EPA's voltage and amperage limitations to have the requisite valid factual foundation, they must have a correlation with emissions to such a degree that imposing such limitations would assure compliance. On the record before us, we cannot say that such a correlation exists. Ohio EPA's witnesses, including Sparks and Orlemann, admitted they could not predict the effect on emissions if voltage and amperage were decreased. Further, although both Orlemann and Sparks believed operation of the ESP within the permit ranges would assure compliance with emissions standards, both admitted there were a number of factors that affect the ESP emissions, and no emission rate could be assured without also taking into account the other conditions that affect the emission rate from the ESP.
 {¶ 49} To the contrary, GEL presented convincing evidence, through testimony and the regression analyses and graphs, showing a lack of relationship between voltage or amperage and emission rates. This evidence indicated that, sometimes, when voltage and amperage were increased, the emission rates also increased, which is totally contradictory to the theory underlying Ohio EPA's permit limitations. Parker opined that the graph and regression analyses demonstrate that there is no significant relationship between milliamps or kilovolts and the emissions produced by the ESP. Parker and Hrycik also stated that they could not pinpoint a particular range of kilovolt or milliamp levels for the ESP that would correspond to the emissions of less than the permissible limits. Given this evidence and testimony, one cannot say with any level of assurance what the effect on emissions would be by raising or lowering the voltage and amperage. Every witness agreed that power input was one of many factors that influences emission rates, and Parker and Hrycik both indicated this was the reason why it was impossible for there to be a reliable correlation between only power input and emissions.
 {¶ 50} Although we do not suggest the evidence demonstrated that absolutely no correlation exists between power input and emissions, the evidence presented in this particular case suggests that the correlation is weak and unpredictable without taking into account the myriad of other factors that affect emissions. Given such a weak correlation, attempting to assure compliance with emissions standards by using power input limitations alone would not be reasonable. Ohio EPA's lack of valid factual evidence demonstrating a closer correlation was fatal to its contention that the operational restrictions were reasonable.
 {¶ 51} We also find convincing the 1993 Ohio EPA operation and maintenance guidelines for air pollution control equipment. Although these guidelines indicate that power input to the ESP can be a useful parameter in monitoring ESP performance, it urged caution in using power input as the sole guide. The guidelines warn that care must be taken not to rely solely on power input because other factors may affect ESP performance. The guidelines also indicate that, under some conditions, lowering power input will "substantially improve performance." Further, the guidelines provided that some ESPs are not sensitive to power input changes, and a significant reduction of power input will not cause any substantial performance change, although there was no evidence in the present case to indicate whether GEL's ESP is one of these types that may experience this condition. Thus, Ohio EPA's own operation and maintenance guidelines militate against using power input alone as an operational guideline. Accordingly, we find that ERAC used the proper standard and did not err in determining that Ohio EPA's action was unreasonable.
 {¶ 52} In its second "issue" raised, Ohio EPA contends that the "direct correlation" standard imposed by ERAC violates Ohio and federal law and is against public policy because it threatens Ohio's ability to protect human health and welfare, its ability to administer its Title V program, and its federal highway funding. We find none of these contentions persuasive. Ohio EPA first maintains that the "clear or direct correlation" and "apparent, definable relationship" standards do not appear in the Ohio Revised Code or the federal CAA. However, as noted above, ERAC did not use this language in the present case. That language was from another ERAC case quoted by ERAC. Notwithstanding, we have already found above that the "direct correlation" requirement ERAC did use in this case was not improper. ERAC addressed whether there was a "direct correlation" between power input and emissions limits in order to determine the reasonableness of Ohio EPA's operational restriction, which it was required to do under R.C. 3745.05. To use such a requirement to determine reasonableness was not error, and it was not against public policy.
 {¶ 53} Furthermore, there is no evidence that GEL will not comply with federal law as a result of eliminating the operational restrictions. In fact, all of the evidence submitted in the present case suggests that GEL's ESP operates under the federal limits for emissions. Thus, we fail to see how ERAC's decision conflicts in any way with federal law, such that non-compliance with federal mandates and a loss of funding would necessarily result.
 {¶ 54} Ohio EPA also argues that ERAC's decision will force repeated stack testings, which each cost $10,000. Ohio EPA asserts the effect will be increased costs for Ohio businesses. However, these issues are not before this court in the present case. This court is vested only with the power to determine whether ERAC's present order was supported by reliable, probative, and substantial evidence and in accordance with law. We have found that it was. What alternatives exist to the invalid operational restrictions placed in GEL's permit remains to be determined, and the question whether these alternatives to a restriction based solely on power input are lawful and reasonable is left to future cases. Therefore, we find the standard used by ERAC did not violate Ohio and federal law, threaten Ohio's ability to protect human health and welfare, threaten its ability to administer its Title V program, or jeopardize Ohio's federal funding.
 {¶ 55} In sum, we find, based on the record before us, that the operational restrictions are both unreasonable and unlawful because they do not assure compliance with applicable requirements. Thus, we find that ERAC's conclusion, that the operational restrictions Ohio EPA placed in GEL's Title V permit did not assure compliance with the applicable requirements for particulate emissions, was supported by reliable, probative, and substantial evidence and is in accordance with law. Therefore, we overrule Ohio EPA's assignment of error.
 {¶ 56} GEL argues in its second assignment of error that ERAC erred in its ruling on a pre-hearing motion that GEL had the burden at the hearing de novo of proving that restrictions on the operation of the ESP were unreasonable. However, having concluded that the restrictions are unreasonable and unlawful, the issue regarding the burden of proof no longer has practical legal effects between these parties. See Grove City. Therefore, resolution of the burden of proof question is not appropriate in this case, and we decline to address GEL's second assignment of error.
 {¶ 57} For these reasons, we sustain GEL's first assignment of error, we find GEL's second assignment of error to be moot, and we overrule Ohio EPA's assignment of error. Therefore, we affirm in part and reverse in part the order of the Environmental Review Appeals Commission.
Order affirmed in part and reversed in part.
McGrath, J., concurring.
Brown, J., concurring in part and dissenting in part.