OPINION
{¶ 1} Appellants, Citizens Against Megafarm Dairy Development, Inc. ("CAMDD"), appeal from an order of the Environmental Review Appeals Commission ("ERAC") that affirmed the decision of appellee, Fred Dailey, Director of the Ohio *Page 2 
Department of Agriculture ("ODA"), to grant appellee, Frisian Hijma Dairy, LLC ("Hijma Dairy" or "dairy"), a permit to install ("PTI") and permit to operate ("PTO") a Concentrated Animal Feeding Facility ("CAFF"). Because reliable, probative, and substantial evidence supports the order, and the order is in accordance with law, we affirm.
 {¶ 2} On June 27, 2003, Hijma Dairy submitted PTI and PTO applications to ODA for approval to construct and operate an 825 dairy cow facility in Hardin County, Ohio. The proposed facility consists of one free stall dairy barn for 536 dairy cattle, one dry cattle dairy barn for 289 dairy cattle, a milking parlor, and an earthen storage pond for contaminated storm water. Particularly important to this appeal, the facility also included an earthen manure storage pond and a concrete-lined sand settling basin. According to the application, the settling basin is designed to remove solids from the manure. The sifted manure then is stored in the manure pond until utilized as fertilizer when the field's soil conditions are suitable. ODA regulates the proposed dairy as a statutorily defined CAFF.
 {¶ 3} CAMDD members organized to oppose the dairy's application, fearing the dairy's operations might contaminate the groundwater drawn through their contiguous private wells. CAMDD members were particularly concerned that the proposed locations for the dairy manure storage facilities lacked the necessary clearance above the members' source of drinking water.
 {¶ 4} Andrew Ety, a professional engineer ODA hired to process CAFF permit applications under the guidelines of the Livestock Environmental Permitting Program ("LEPP"), reviewed Hijma Dairy's PTI and PTO applications for compliance with LEPP laws and regulations. After finding the dairy complied with all applicable regulatory *Page 3 
requirements, he recommended the ODA director issue the permits. On November 7, 2003, the ODA director issued Hijma Dairy the requested permits. CAMDD timely appealed, setting forth five separate assignments of error relating to the dairy's alleged violations of ODA's aquifer siting restrictions, ODA's inadequate review of the permits, and the potential for water contamination. After conducting a four-day de novo hearing, ERAC affirmed the ODA director's decision to grant Hijma Dairy the permits. Pursuant to R.C. 3745.06, CAMDD appeals to this court, assigning three errors:
 I. THE ENVIRONMENTAL REVIEW APPEALS COMMISSION ERRED IN UPHOLDING THE PERMITS WHICH WERE VOID AB INITIO BECAUSE THE DIRECTOR VIOLATED HIS LEGAL DUTY TO CONDUCT AN INVESTIGATION OF THE AQUIFER SITING RESTRICTION AS REQUIRED BY HIS REGULATIONS.
 II. THE ENVIRONMENTAL REVIEW APPEALS COMMISSION ERRED IN UPHOLDING THE PERMITS WHERE THE DIRECTOR ADMITS THAT HE BASED HIS DETERMINATION OF THE AQUIFER MERELY ON TWO WELL LOGS WHICH DO NOT CONSTITE [sic] RELIABLE, PROBATIVE, AND SUBSTANTIAL EVIDENCE AND IS NOT IN ACCORDANCE WITH LAW.
 III. THE ENVIRONMENTAL REVIEW APPEALS COMMIS SION ERRED IN UPHOLDING THE PERMITS BY RELYING UPON THE DEPARTMENT OF HEALTH'S "WELL-CASING" REQUIREMENT WHICH UNREASONABLY CONFLICTS WITH THE ODA'S OWN AQUIFER SITING RESTRICTION.
 {¶ 5} An appellate court shall affirm an ERAC order if it finds "the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 3745.06. "In the absence of such a finding," the court "shall reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." Id. Reliable evidence can be trusted. *Page 4 Gen. Elec. Lighting v. Koncelik, Franklin App. No. 05AP-310,2006-Ohio-1655, ¶ 10, citing Our Place, Inc. v. Ohio Liquor ControlComm. (1992), 63 Ohio St.3d 570, 571. In order for evidence to be reliable, there must be a reasonable probability that it is true. Id. Probative evidence tends to prove the issue in question, while substantial evidence carries weight or has importance and value. Id.
 {¶ 6} Before addressing CAMDD's assignments of error, Hijma Dairy challenges CAMDD's standing to appeal from the ODA director's action to ERAC. R.C. 3745.04 governs appeals to ERAC and provides that "[a]ny person who was a party to a proceeding before the director of environmental protection may participate in an appeal to the environmental review appeals commission for an order vacating or modifying the action of the director * * *." This court employs a two-prong test to determine whether a person is a party for the purposes of R.C. 3745.04. Martin v. Schregardus (Sept. 30, 1996), Franklin App. No. 96APH04-433. "First, did the person appear before the director, presenting his arguments in writing or otherwise; and, second, was the person `affected' by the action or proposed action." Id. Hijma Dairy contests whether the dairy's operations will adversely affect CAMDD.
 {¶ 7} A proposed action "affects" a party if (1) the challenged action will cause injury in fact, economic or otherwise, and (2) the interest sought to be protected is within the realm of interests regulated or protected by the statute being challenged. Olmsted Falls v. Jones,152 Ohio App.3d 282, 2003-Ohio-1512, ¶ 21, citing Franklin Cty. RegionalSolid Waste Mgmt. Auth. v. Schregardus (1992), 84 Ohio App.3d 591. The alleged injury must be concrete, rather than abstract or suspected. A party must show that he or she will suffer a specific injury, even slight, from the challenged action or inaction, and that the *Page 5 
injury is likely to be redressed if the court invalidates the action or inaction. Id. If a threatened injury is alleged, the party must demonstrate a realistic danger arising from the challenged action. Id.
 {¶ 8} Here, CAMDD consists of approximately 20 citizens whose homes are located within one to two miles southeast of the proposed dairy. The citizens use wells to draw groundwater for their personal consumption. Evidence adduced at the de novo hearing before ERAC revealed that if the dairy released contaminants into the ground, it would take over 45 years for the contaminants to reach the citizens' wells. Although Hijma Dairy contends that, through decay and attenuation, the threat of the contaminants would lessen over this time period, a realistic, albeit slight, danger remains that the dairy's operations could contaminate the citizens' wells. Because CAMDD challenges the director's actions regarding the dairy's compliance with the aquifer siting criteria, a statute aimed at protecting the groundwater that the dairy's contiguous citizens use, CAMDD has standing to appeal this case.
I. First Assignment of Error {¶ 9} CAMDD's first assignment of error contends the permits are void ab initio because ODA failed to properly determine whether Hijma Dairy's manure storage and treatment facilities complied with the aquifer siting restrictions under former Ohio Adm. Code 901:10-2-02(A)(1)(e). The administrative code section stated that "[f]ifteen vertical feet of low permeability material, including the liner thickness," shall separate a "manure storage pond" from "an aquifer." CAMDD argues that absent sufficient evidence to prove which geological formation is the site's aquifer, the ODA director's order necessarily fails to ensure the dairy complied with the aquifer siting criteria. CAMDD *Page 6 
contends the evidentiary deficiency renders the permits unlawful under the authority of Concerned Citizens of Central Ohio v. Schregardus
(2002), 148 Ohio App.3d 31 and Licking County Citizens for a SafeEnvironment v. Schregardus (2000), 136 Ohio App.3d 645.
 {¶ 1O} CAMDD relies on Licking County Citizens to argue that the director's decision to issue a permit is unlawful and unreasonable when the director fails to determine whether a permit application complies with regulatory laws or rules. In Concerned Citizens, this court held that because the director is required to consider compliance with all applicable laws prior to issuing a permit, his failure to evaluate the applicability of the exemption under R.C. 3704.01(B) prior to issuing the permits rendered the issued permits invalid. We concluded ERAC was not empowered to validate the permits based on its de novo review because the director, not ERAC, is charged with making the initial determination on regulatory issues.
 {¶ 11} Here, unlike Licking County Citizens and ConcernedCitizens, ODA evaluated Hijma Dairy's permit application and determined prior to issuing the permits that the proposed dairy's manure storage facilities were in compliance with all applicable laws and regulations. Although CAMDD admits this significant difference, it proposes the cases equally apply to the instant situation where it alleges ODA failed to obtain information necessary to determine whether the dairy's proposed manure storage pond complied with the aquifer siting criteria. Even if this court were to so broadly construe Licking County Citizens andConcerned Citizens, ODA nevertheless fulfilled its review obligation by ensuring the subsurface geological exploration results contained in the dairy's permit application satisfied the manure storage pond's aquifer siting criteria. *Page 7 
 {¶ 12} An application will be deemed complete when all the statutory and regulatory enumerated and mandatory components of the application have been reasonably and fully answered. Harmony Envtl. Ltd. v. MorrowCounty Dist. Bd. of Health, Franklin App. No. 04AP-1338, 2005-Ohio-3146, at ¶ 13. Pertinent to this appeal, Ohio Adm. Code 901:10-2-03(B) requires an engineering geologist or a professional engineer to supervise a "subsurface geographical exploration" before an applicant installs a manure storage pond. The subsurface geological exploration must be performed within a reasonable distance of the manure storage pond boundaries and include a minimum of four test pits or borings placed at regular intervals. In addition, the exploration must determine (1) the type of hydraulic conductivity of the soil material, (2) the suitability of the soil material to provide adequate sealing, (3) whether the proposed manure storage pond is to be located within a karst area, and (4) baseline water quality from a well existing at the facility. ODA may require additional subsurface geological explorations depending on the soils and geological formations on site to ensure the protection of the groundwater. Ohio Adm. Code 901:10-2-03(B)(2)(g).
 {¶ 13} The results of the subsurface geological exploration must be included in a report submitted with the facility design plans. Ohio Adm. Code 901:10-2-03(C). The report must include (1) the location of the facility well, exploration pits and borings plus locations and depths of soil samples, (2) available Ohio Department of Natural Resources, Division of Water, well water logs located within a minimum of 1,000 feet of the planned manure storage or treatment facility, (3) geologic information, (4) evidence of seepage or groundwater conditions and depths of pits, (5) determination of the suitability of in-situ soils for the planned facility, or lining recommendations when the in-situ soils are *Page 8 
unsuitable, (6) recommendation from the laboratory analysis of the compactive effort or soil density, and soil moisture requirements needed during construction to achieve design hydraulic conductivity, and (7) the results of the soil tests. Ohio Adm. Code 901:10-2-03(C)(1). Based on the results of the tests, the professional engineer, geologist, or director may require additional explorations that may include laboratory testing of soils and additional ground water monitoring wells. Ohio Adm. Code 901:10-2-03(C)(2).
 {¶ 14} Once ODA receives a permit application, an ODA engineer reviews the application to ensure its compliance with LEPP laws and regulations. One such regulation, Ohio Adm. Code 901:10-2-02(A)(1)(e), requires that at least 15 vertical feet of low permeability material separate an "aquifer" yielding less than 100 gallons per minute from a manure storage facility. An "aquifer" is defined as "an underground consolidated or unconsolidated geological formation or series of formations that are hydraulically connected and that have the capability to receive, store, and yield usable quantities of water to wells. Aquifer does not include perched groundwater." Ohio Adm. Code901:10-1-02(H). When an ODA engineer is satisfied that the applicant has satisfactorily fulfilled all regulatory requirements, he or she recommends that the director issue a permit.
 {¶ 15} Here, David Gerdeman, a professional engineer and president of North Point Engineering, in conjunction with a staff geologist, conducted the subsurface geological exploration and prepared the required report on behalf of Hijma Dairy. A map provided through the Ohio Department of Natural Resources, Division of Water, revealed the proposed manure storage pond site is not in a karst area. Gerdeman drilled eight standard soil borings with depths ranging from 9.5 to 34.5 feet below ground surface, including four into the corners and one into the center of the proposed manure storage *Page 9 
pond. Gerdeman sent the soil samples to a certified testing laboratory to evaluate the type of soil material and test its hydraulic conductivity. The test results revealed the soil material was low permeability with hydraulic conductivity of 2 x 10-[7]
centimeters per second (cm/sec). Because the proposed manure storage site would not adequately seal the bottom of the manure storage pond or achieve the ODA required hydraulic conductivity of 1 x 10-[7] cm/sec, the report recommended that Hijma Dairy use a three-foot recompacted soil liner to achieve the required hydraulic conductivity.
 {¶ 16} Using the Unified Soil Classification System and the American Association of State Highway and Transportation Officials guidelines, the laboratory classified the soil material as "sandy lean clay" and "gravelly lean clay with sand," both considered low permeability soils. Gerdeman also tested the soil's permeability by referring to theSoil Survey of Hardin County, Ohio. The soil survey identified the soils as a combination of Blount, a poorly drained soil with moderately slow permeabilities, and Pewamo, a very poorly drained soil with low permeabilities. Gerdeman submitted the lab reports with the dairy's geological report.
 {¶ 17} Gerdeman then combined the results from the soil borings with the logs of two wells located within 1,000 feet of the dairy's proposed manure storage facility to specifically determine whether 15 feet of low permeable soil material existed between the bottom of the proposed storage facility and the uppermost aquifer. The water well logs revealed a 12 to 12 and one-half foot thick layer of low permeability brownish-gray clay beneath the topsoil. The next soil horizon consisted of a wet highly permeable mixture of medium to coarse sand and gravel. The sand layer stretched from a depth of 12 and one-half feet to 24 and one-half feet. A layer of low permeability gray clay then extended *Page 10 
approximately 48 feet deep below the sand layer to a limestone dolomite formation. The soil borings corroborated the data from water well logs on the first two layers' soil composition and depth. The soil borings also demonstrated that the first few feet of soil beneath the sandy layer consisted of the same clay identified in the water well logs.
 {¶ 18} After consulting the well logs and an Ohio State University Extension Fact sheet entitled Hardin County Ground-Water Resources, Gerdeman identified the limestone dolomite layer as the aquifer for Hijma Dairy's site. Because the static water level in the sand layer ranged from 8.3 to 11.3 feet and the static water level of the limestone dolomite layer ranged from 14 to 34 feet, Gerdeman's report determined the two layers were not in hydrologic communication. Gerdeman identified the sand layer as perched groundwater.
 {¶ 19} Gerdeman disclosed the exploration's results and determinations along with the supporting data to ODA as part of Hijma Dairy's permit application. ODA reviewed the application, found the report adequately characterized the site geology and hydrogeology, and considered whether the sand layer or limestone dolomite layer was the aquifer for the site. After determining the limestone dolomite layer was the site's aquifer, ODA concluded that Hijma Dairy complied with the aquifer siting criteria. Although CAMDD challenges the adequacy of the information used to make the determination, the record reflects that the dairy's permit application fully complied with all the regulatory enumerated components required for a subsurface geological exploration.
 {¶ 20} Contrary to CAMDD's contentions, the director was not required to conduct additional testing to ensure the dairy complied with the aquifer siting criteria, but could rely on that information the subsurface geological exploration required before issuing a permit. *Page 11 
See Ohio Adm. Code 901:10-2-03(B)(2)(g) (stating "[t]he departmentmay require additional subsurface geological explorations * * * to ensure the protection of the groundwater"); see, also, CECOS Internatl.,Inc. v. Shank (1991), 74 Ohio App.3d 43 (distinguishing between quality and completeness in an application). Because ODA reviewed Hijma Dairy's permit application upon information that adequately completed the subsurface geological exploration requirement needed for approval, ODA satisfied the evaluation obligation CAMDD proposed in reliance onLicking County Citizens and Concerned Citizens.
 {¶ 21} CAMDD further argues Hijma Dairy's permits are invalid underLicking County Citizens and Concerned Citizens because the director's evaluation of the proposed manure storage pond's compliance with the aquifer siting criteria was based on "scientifically incompetent or facially unreliable" information. By so phrasing its argument, CAMDD attempts to persuade this court to re-weigh the evidence the director used to support his decision. This court, however, reviews all the evidence presented to ERAC at the de novo hearing, not just that contained in the permit application. Northeast Ohio Regional SewerDistrict v. Shank (1991), 58 Ohio St.3d 16, paragraph two of syllabus. Because, under the proper standard of review, CAMDD's argument essentially raises the same issue presented in CAMDD's second assignment of error, we will discuss it under that assignment of error.
II. Second Assignment of Error {¶ 22} CAMDD's second assignment of error contends ERAC erred in affirming the director's decision to issue the permits to Hijma Dairy, as (1) the director relied on evidence that was not reliable, probative, or substantial, and (2) his decision to issue the *Page 12 
permits is contrary to law. CAMDD confuses this court's standard of review with the standard ERAC uses to review the director's actions. ERAC reviews the quality of information contained in a permit application and, together with testimony adduced at the de novo hearing, considers whether the director's actions were unreasonable or unlawful, ultimately determining whether a factual foundation supports the director's action. Tube City Olympic of Ohio, Inc. v. Jones, Franklin App. No. 03AP-295, 2004-Ohio-1464, ¶ 23. An appellate court's review is limited to whether reliable, probative, and substantial evidence supports ERAC's order finding the director's decision reasonable and lawful. This court therefore must determine whether the evidence presented to ERAC concerning the proposed manure storage pond's compliance with aquifer siting criteria substantially, reliably, and probatively supports ERAC's order. Harmony, at ¶ 7; Tube City, supra, at ¶ 26.
 {¶ 23} Such a determination inevitably involves our considering the evidence and to a quite limited extent permits us to substitute our judgment for that of ERAC. Id. The General Assembly, however, created administrative bodies to facilitate decisions in certain areas of the law by placing the administration of those areas before boards or commissions composed of individuals who possess special expertise. SeePons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, paragraph one of the syllabus. Accordingly, the courts should give due deference the administrative resolution of evidentiary conflicts. Harmony, at ¶ 8.
 {¶ 24} At the de novo hearing before ERAC, the parties offered conflicting testimony as to whether the dairy's proposed manure storage pond complied with the aquifer siting criteria. Specifically, the parties' disagreed whether the sand layer or the *Page 13 
limestone dolomite layer beneath the proposed storage pond was the site's "aquifer" as defined by Ohio Adm. Code 901:10-1-01(H). If, as CAMDD contends, the sand layer is the site's aquifer, the proposed manure storage pond would violate the aquifer siting criteria because an inadequate distance separates the pond from the sand layer. The diverging opinions focused primarily on whether the sand layer satisfied the three elements defining an aquifer: (1) a geological formation or series of geological formations that are hydraulically connected, (2) capable of receiving, storing, and yielding usable quantities of water to wells, (3) that is not perched groundwater. Gerdeman, Ety, Kevin Elder and Eric Cherry testified on behalf of appellees; Dr. Julie Weatherington-Rice testified on behalf of CAMDD.
 {¶ 25} Gerdeman reiterated the reasons set forth in his geological report to explain why the limestone dolomite layer was the site's aquifer: the Hardin County Ground-Water Resources fact sheet identified the limestone dolomite formation as the principal source of groundwater in Hardin County, and the two wells located within 1,000 feet of the proposed manure storage pond both draw water from the limestone dolomite formation. Cherry concurred with Gerdeman's conclusion and added that the 69 wells located within a three-mile radius of the site draw water from the same limestone dolomite formation.
 {¶ 26} Dr. Julie Weatherington-Rice testified on behalf of CAMDD and disputed Gerdeman and Cherry's conclusion. She first argued that the site's aquifer is a "series of formations that are hydraulically connected," beginning with the sand layer and ending with the limestone dolomite formation. Although Dr. Rice never visited the dairy's proposed location, she examined Gerdeman's subsurface geological exploration and testified that she believes fractures are present in the till beneath the dairy's proposed *Page 14 
storage manure pond. Dr. Rice based her belief on a reference article in which fractures were recorded in Hardin County tills. She testified that these fractures hydraulically connect the sand layer to the limestone dolomite formation and, by that connection, dramatically increase the soil's permeability.
 {¶ 27} Cherry testified in rebuttal to Dr. Rice's theory, using photographs he took of the sand layer and stating that none of the fractures contained water. Initially, he noted that although the photos revealed microfractures 10 feet below ground level and single fractures at 12, 14, and 16 feet, the fractures' oxidation was very thin and appeared only at the edge. According to Cherry, the thin layer of oxidation proved very little water moved down through the upper fractures. Cherry testified that no fractures existed below the sand layer.
 {¶ 28} Cherry also conducted a pump test of the sand layer to identify its boundaries and ascertain the amount of water in the layer. During the pump test, Cherry observed no significant fluctuations in the on-site well's static water level, confirming Gerdeman's conclusion that the sand layer was not hydraulically connected to the limestone dolomite layer. As Cherry explained, if the sand layer and limestone dolomite layer were hydraulically connected, the water level in the on-site well would have dropped as the water was removed from the aquifer and pumped out of the test well. Cherry further bolstered Gerdeman's conclusion by testifying that the water level in the sand layer rose dramatically when the drill penetrated the clay layer above the sand layer. From this testimony, Cherry concluded that if the sand and limestone dolomite layers were already hydraulically connected, the additional water passage would not significantly change the water level. *Page 15 
 {¶ 29} Dr. Rice next testified the sand layer was hydraulically connected to the limestone dolomite layer because the proposed manure storage pond more than likely sits on an end moraine glacial setting. Dr. Rice explained that a topography map of the site depicts a "hummocky" terrain typical in end moraine settings. She testified that end moraine settings usually contain multiple high permeability layers of sand and gravel that allow water to rapidly flow downhill into the limestone dolomite layer. Cherry, on the other hand, personally observed the site's topography and testified that the site's fairly level terrain was most typical of a transitional zone between a ground moraine and end moraine. Cherry stated that a glacier deposits less sand in a transitional zone, and the sand layers are less extensive and further apart than in an end moraine.
 {¶ 30} Dr. Rice also testified that the sand layer was the site's uppermost aquifer because it was capable of providing a usable quantity of water to the area's wells. Dr. Rice used the results from Cherry's pump test and opined that the sand layer's yield of 23 gallons per minute (gpm) was "huge" and capable of sustaining four-member families in some parts of Ohio. By contrast, Cherry testified that 23 gpm was not a large amount of water, especially for Hardin County. Cherry also noted that because the water levels decreased at a faster rate toward the end of the pump test, the sand layer had finite boundaries and the water was being emptied as the test progressed. Stated another way, if the sand layer had no boundaries, and the layer was regionally continuous, the water levels would not have decreased.
 {¶ 31} Similarly, Ety testified the 23 gpm of water yielded from the sand layer was not a "usable quantity of water" for drinking because the Ohio Department of Health required that the upper 25 feet of any well be enclosed with casing to prevent surface *Page 16 
contamination from reaching the well water. Ety continued, observing that the small portion of the sand layer deeper than 25 feet would not produce an adequate water supply for a residence. Ety and Elder also testified that the sand layer would not provide usable quantities of water for irrigation purposes: because irrigating one acre of land requires a water supply capable of producing 10 to 15 gpm, 23 gpm is insufficient to irrigate a property the size of Hijma Dairy. Elder and Ety further testified that the sand layer would be susceptible to failure during drought times, the time irrigation typically occurs, due to its close proximity to the surface.
 {¶ 32} After considering the competing testimony, ERAC concluded the evidence supported the director's determination that the limestone dolomite layer was the relevant aquifer for ODA siting purposes. Because approximately 49 feet of low permeability soil separates the bottom of the dairy's proposed manure storage pond from the limestone dolomite layer, ERAC held Hijma Dairy satisfied the relevant siting criteria in Ohio Adm. Code 901:10-2-02. Reliable, probative, and substantial evidence supports ERAC's decision.
 {¶ 33} Hijma Dairy's expert witnesses, Gerdeman and Cherry, testified that the limestone dolomite layer was the site's aquifer. Both general data identifying the limestone dolomite as the county's principal aquifer, and specific data from well logs within a three-mile radius of the dairy, supports their conclusion. Although CAMDD contends theHardin County Ground-Water Resources fact sheet and well log data are inherently unreliable, they, when combined with Cherry, Ety and Elder's testimony that the sand layer was not the site's aquifer, provided a valid factual foundation for ERAC to determine the limestone dolomite is the site's aquifer. *Page 17 
 {¶ 34} Cherry, Ety and Elder's testimony buttressed the presumption the fact sheet and well logs created that, like most of Hardin County and all the wells within the site's three-mile radius, the limestone dolomite layer is Hijma Dairy's aquifer. By eliminating the only other possible aquifer on the dairy's site, the evidence presented to ERAC created a reasonable probability that limestone dolomite is the site's aquifer. Although CAMDD's expert witness, Dr. Rice, contested the credibility of, and asserted differing opinions from, Hijma Dairy's experts, ERAC was charged with the duty to weigh the evidence and determine its credibility. Because the requisite quantum of evidence supports ERAC's decision, this court must defer to ERAC's special expertise for resolving the evidentiary conflicts. Accordingly, CAMDD's first and second assignments of error are overruled.
III. Third Assignment of Error {¶ 35} CAMDD's third assignment of error contends ERAC erred in upholding the permits by unlawfully relying on the ODH "well-casing" requirement. The well-casing rule requires at least 25 feet of casing below ground level to separate a well from contaminants that could seep from the ground surface into the well. Ohio Adm. Code 3701-28-12. CAMDD argues the "well-casing" requirement unreasonably conflicts with ODA's own aquifer siting restriction because it impermissibly nullifies the protections ODA's aquifer siting criteria afford. CAMDD contends that, by requiring 25 feet of casing for water to be usable, the well-casing rule effectively prevents a geological formation shallower than 25 feet from ever being characterized as an aquifer. CAMDD claims that result negates the aquifer siting criteria's language recognizing the possibility that an aquifer may sit 15 feet below a manure storage pond. CAMDD therefore concludes that *Page 18 
ERAC erred in considering the well-casing requirement in determining whether the sand layer was capable of receiving, storing, and yielding usable quantities of water to wells.
 {¶ 36} In interpreting statutes, courts are required to give due deference to an administrative interpretation formulated by an agency that has accumulated substantial expertise, and to which agency the Ohio General Assembly has delegated the responsibility of implementing the legislative command vis-a-vis Ohio Administrative Code sections, including those related to the EPA. North Sanitary Landfill, Inc. v.Nichols (1984), 14 Ohio App.3d 331, 337, citing Jones Metal Products Co.v. Walker (1972), 29 Ohio St.2d 173, 181. Where, however, the agency's interpretation is repugnant to the statute, rule, or section, the courts should not accept the regulation or interpretation. Id., citingAnderson Bros. Ford v. Valencia (1981), 452 U.S. 205, 219.
 {¶ 37} Here, Elder, the ODA executive director for LEPP, testified that a newly constructed dairy facility, such as Hijma Dairy, must comply with state health guidelines for well construction, including the depth of well casing. Elder explained that although the well-casing rule may sometimes overlap with the aquifer siting criteria, such as in the case of a shallow aquifer, the well-casing requirement does notconflict with the aquifer siting criteria. Rather, the well-casing requirement assists ODA in identifying whether a geological formation is an aquifer by determining whether the formation is capable of receiving, storing, and yielding usable quantities of water to well; the aquifer siting criteria establish the distance that must separate a manure storage pond from an aquifer. The two rules mutually coexist for the purpose of preventing contamination of groundwater on a dairy farm. Because the well-casing requirement does not conflict with the aquifer siting criteria, we defer to ODA's interpretation and application of the well-casing requirement to *Page 19 
decide whether an aquifer is capable of receiving, storing, and yielding usable quantities of water to wells. Accordingly, CAMDD's third assignment of error is overruled.
 {¶ 38} Having overruled CAMDD's three assignments of error, we affirm the judgment of the Environmental Review Appeals Commission.
Judgment affirmed.
 SADLER, P.J., and McGRATH, J., concur. *Page 1