**HELMS, d.b.a. CountryView South Apartments, Appellants,**

v.

**KONCELIK, Dir., Environmental Protection Agency, Appellee.**

[Cite as *Helms v. Koncelik*, 187 Ohio App.3d 231, 2010-Ohio-1782.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 09AP–628 and 09AP–634.

Decided April 20, 2010.

William T. Whitaker Co., L.P.A., William T. Whitaker, and Andrea L. Whitaker, for appellants.

Richard Cordray, Attorney General, Gregg H. Bachmann, and L. Scott Helkowski, Assistant Attorneys General, for appellee.

KLATT, Judge.

{¶ 1} Appellant, Joel A. Helms, appeals from a final order of the Environmental Review Appeals Commission ("ERAC") affirming the final action of appellee, Joseph P. Koncelik, director of the Ohio Environmental Protection Agency ("OEPA"), denying Helms a permit to install components of a wastewater-treatment plant. For the following reasons, we affirm.

{¶ 2} Helms and his family own CountryView South Apartments, a 34-unit apartment building located in North Canton, Ohio. In 1974, the OEPA issued Helms a permit to install a 10,000-gallon-per-day, extended-aeration wastewater-treatment plant to serve CountryView. Although the plans for the proposed wastewater-treatment plant included an 825-square-foot surface-sand filter, Helms did not construct that portion of the plant. Without the surface-sand filter, the wastewater that cycled through the plant did not receive any tertiary treatment. As constructed, the plant provided only primary and secondary treatment to the wastewater before discharging it into Dickerhoof Ditch.

{¶ 3} In 1985, a farmer accidentally cut the discharge pipe that extended from the CountryView wastewater-treatment plant to Dickerhoof Ditch. Wastewater then seeped into the field near the plant, eventually causing two wetland cells to develop.

{¶ 4} On July 16, 2002, Helms submitted to the OEPA a permit to install an application that proposed the creation of a constructed wetland to provide tertiary treatment to the wastewater emitted by CountryView. Specifically, the application included plans for a two-cell constructed wetland, and it contemplated that wastewater leaving the wastewater-treatment plant would flow through the

constructed wetland cells before passing into the existing wetland cells. Ultimately, the wastewater would be discharged into Dickerhoof Ditch.

{¶ 5} Jennifer Bennage, an environmental engineer with the OEPA's Division of Surface Water, reviewed Helms's application. In a letter dated August 13, 2002, Bennage communicated her initial comments on the application to Ken Jensen, the professional engineer who drafted the engineering plans for the constructed wetland. To Bennage, the application and plans were incomplete. Most significantly, the application lacked an engineering report explaining the basis of design and setting forth the design calculations for the constructed wetland. Bennage informed Jensen that the OEPA required such a report.

{¶ 6} To assist Jensen in drafting the engineering report, Bennage directed him to three United States Environmental Protection Agency ("USEPA") publications that provide guidance for the design of constructed wetlands for wastewater treatment. These publications contain the formulas a design engineer must use to determine whether a planned wetland can function appropriately and adequately treat the wastewater flowing into it. To complete these design calculations, the engineer would need data from to his specific site, e.g., the wastewater-inflow flow rate, the volume of water the wetland can store, the hydraulic gradient, and the porosity and hydraulic conductivity of the substrate the engineer plans to use (typically gravel and sand).

{¶ 7} By correspondence dated January 23, 2003, Helms informed the OEPA that "[u]pon review of [US]EPA literature no further comments could be given" and "[b]ased on principle of duplicate documents, report not necessary." Additionally, Jensen told Bennage that he would not submit an engineering report to supplement the permit-to-install application.

{¶ 8} Bennage then prepared a report recommending that the OEPA deny Helms's permit-to-install application. The report listed 12 reasons justifying the denial, beginning with Helms's failure to submit an engineering report that included the basis of design and design calculations for the constructed wetland. Without the basis of design, Bennage could not determine whether the proposed project met the criteria of Ohio Adm.Code 3745–42–04(A), which governs the issuance of permits to install.[1]

---

1. Actually, Bennage assessed the permit application under former Ohio Adm.Code 3745–31–05, not Ohio Adm.Code 3745–42–04. Effective October 17, 2003, an amendment to the Ohio Administrative Code reorganized the relevant regulation, and the provisions originally set forth in Ohio Adm.Code 3745–31–05 appeared instead in Ohio Adm.Code 3745–42–04. At the hearing on the denial of Helms's application, Bennage testified that former Ohio Adm.Code 3745–31–05 and current Ohio Adm.Code 3745–42–04 are substantially similar. Subsequent to the amendment, the director cited Helms's failure to satisfy the criteria in Ohio Adm.Code 3745–42–04 as the basis for the denial of the permit application. Likewise, the ERAC

{¶ 9} On July 15, 2003, Bennage met with Jensen to discuss the submission of a revised permit-to-install application that would include information missing from the first application. Apparently, Jensen indicated at that meeting that he would neither submit a revised application nor an engineering report.

{¶ 10} At that point, realizing that she could not rely upon Jensen to provide the calculations justifying the design proposed, Bennage attempted to do the calculations herself. However, Bennage concluded that the application did not contain much of the information she needed to complete the calculations. Thus, Bennage could not determine whether Jensen had appropriately designed and sized the proposed constructed wetland to reduce the pollutants contained in CountryView's wastewater to the required limits.

{¶ 11} On March 9, 2004, the director of the OEPA issued a proposed denial of Helms's permit-to-install application. The director informed Helms that the denial arose from his failure to submit either an engineering report detailing the basis of design or revised detail plans. In response, Helms requested an adjudicatory hearing. He also submitted additional information regarding the proposed constructed wetland. This additional information consisted largely of photocopied excerpts from the USEPA publications that Bennage had referred to in her August 13, 2002 letter. Although Helms provided some information specific to the proposed project, Bennage did not find any of that information helpful in determining whether the constructed wetland actually would provide tertiary treatment to CountryView's wastewater. Additionally, none of the documents that Helms prepared were signed or certified by a professional engineer.

{¶ 12} A hearing examiner conducted an adjudicatory hearing from November 7 through 11, 2005. Helms, Jensen, and Bennage testified to the facts set forth above. Based on the evidence adduced at the hearing, the hearing examiner issued a report and recommendation in which he recommended that the director of the OEPA deny Helms's permit-to-install application. On November 28, 2006, the director adopted the report and recommendation in its entirety.

{¶ 13} Helms appealed the director's denial of his application to the ERAC. In its May 6, 2009 decision and final order, the ERAC affirmed the director's denial of Helms's permit-to-install application. Helms now appeals from the ERAC's final order to this court, and he assigns the following assignments of error:

[1] The commission's denial of [CountryView's] [permit-to-install] application was in violation of Article I § 19(b) of the Constitution of the state of Ohio.

---

reviewed whether the proposed constructed wetland met the Ohio Adm.Code 3745–42–04 requirements. On appeal to this court, Helms does not challenge the use of Ohio Adm.Code 3745–42–04, rather than former Ohio Adm.Code 3745–31–05, to adjudge his permit.

[2] The commission's decision to deny [CountryView's] [permit-to-install] application was not supported by reliable, probative and substantial evidence because the commission erroneously found that the existing wetland cells are waters of the state.

[3] The commission's finding that the wetland cells did and/or would not provide effective tertiary treatment for the [wastewater-treatment plant] at [CountryView] and its decision to, therefore, deny [CountryView's] [permit-to-install] application was not supported by reliable, probative and substantial evidence.

{¶ 14} Before we address the merits of Helms's appeal, we must first resolve the director's motion to dismiss. The director argues that this court must dismiss Helms's appeal because he failed to file his notices of appeal within the 30–day window provided by R.C. 3745.06. The director contends that the ERAC properly served Helms with its final order on May 6, 2009, but that Helms delayed filing his notices of appeal until June 26, 2009—51 days after service.

{¶ 15} " 'Where a statute confers the right of appeal, an appeal may be perfected only in the manner prescribed by statute.' " *Stark–Tuscarawas–Wayne Joint Solid Waste Mgt. Dist. v. Republic Waste Servs. of Ohio II, L.L.C.,* 10th Dist. No. 07AP–599, 2009-Ohio-2143, 2009 WL 1263623, ¶ 11, quoting *Camper Care, Inc. v. Forest River, Inc.,* 10th Dist. No. 08AP–146, 2008-Ohio-3300, 2008 WL 2588616, ¶ 8. See also *Club 3000 v. Jones,* 10th Dist. No. 07AP–593, 2008-Ohio-5058, 2008 WL 4416663, ¶ 7, quoting *Zier v. Bur. of Unemp. Comp.* (1949), 151 Ohio St. 123, 38 O.O. 573, 84 N.E.2d 746, paragraph one of the syllabus (" '[a]n [administrative] appeal, the right to which is conferred by statute, can be perfected only in the mode prescribed by statute. The exercise of the right conferred is conditioned upon compliance with the accompanying mandatory requirements' "); *Helms v. Koncelik,* 10th Dist. No. 08AP–323, 2008-Ohio-5073, 2008 WL 4416529, ¶ 17 ("strict compliance with statutory filing requirements is a necessary precursor to jurisdiction' "). Pursuant to R.C. 3745.06:

> Any party adversely affected by an order of the environmental review appeals commission may appeal * * *. Any party desiring to so appeal shall file with the commission a notice of appeal designating the order appealed. A copy of the notice also shall be filed by the appellant with the court, and a copy shall be sent by certified mail to the director of environmental protection unless the director is the party appealing the order. Such notices shall be filed and mailed within thirty days after the date upon which the appellant received notice from the commission by certified mail of the making of the order appealed.

Ohio Adm.Code 3746–13–01(A), which amplifies R.C. 3745.06, states that notices of appeal "shall be filed and mailed within thirty days after the date upon which

appellant received notice from the commission of the issuance of the order." Thus, both statute and regulation require an appellant to file his notices of appeal within 30 days after receiving notice from the ERAC of its final order.

{¶ 16} Here, the ERAC initially sent Helms a copy of its final order by certified mail on May 6, 2009. The United States Postal Service ("USPS") returned the mail to the ERAC marked "unclaimed" on May 28, 2009. That same day, the ERAC forwarded the final order to Helms by e-mail and regular mail.

{¶ 17} According to Helms, in May 2009, he received a notice that his post office was holding a piece of certified mail for him. He visited the post office to retrieve the mail but discovered that it was unavailable because his postal carrier was attempting delivery again. When Helms later tried to retrieve the mail, a postal worker told him that the USPS had returned the mail to the sender. On June 1, 2009, Helms received a copy of the ERAC's final order by regular mail.

{¶ 18} Applying R.C. 3745.06 and Ohio Adm.Code 3746–13–01(A) to the above facts, we conclude that Helms timely filed his notices of appeal. Contrary to the director's argument, an appellant must file his notices of appeal within 30 days of *receipt* of the final order, not *service* of the final order. Consequently, Helms had to file his notices of appeal within 30 days of June 1, 2009—the day he received his copy of the final order. Since Helms filed his notices of appeal by June 26, 2009, he complied with R.C. 3745.06 and Ohio Adm.Code 3746–13–01(A). We therefore deny the director's motion to dismiss.

{¶ 19} Turning to the merits of this appeal, we will begin our review with Helms's third assignment of error. By that assignment of error, Helms argues that no reliable, probative, and substantial evidence supports the ERAC's conclusion that the director properly denied his permit to install application. We disagree.

{¶ 20} An appellate court must affirm an ERAC order if it "is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 3745.06. For a court to find evidence reliable, there must be a reasonable probability that the evidence is true. *Spencer v. Korleski*, 10th Dist. No. 08AP–1060, 2009-Ohio-4308, 2009 WL 2596961, ¶ 8; *Stark–Tuscarawas–Wayne Joint Solid Waste Mgt. Dist.*, at ¶ 59; *Citizens Against Megafarm Dairy Dev., Inc. v. Dailey*, 10th Dist. No. 06AP–836, 2007-Ohio-2649, 2007 WL 1560209, ¶ 5. Probative evidence is evidence that tends to prove the issue in question. *Spencer* at ¶ 8; *Stark–Tuscarawas–Wayne Joint Solid Waste Mgt. Dist.* at ¶ 59; *Citizens Against Megafarm Dairy Dev., Inc.*, at ¶ 5. Substantial evidence is evidence that carries weight and has importance and value. *Spencer* at ¶ 8; *Stark–Tuscarawas–Wayne Joint Solid Waste Mgt. Dist.* at ¶ 59; *Citizens*

*Against Megafarm Dairy Dev., Inc.,* at ¶ 5. In determining whether an ERAC order is supported by reliable, probative, and substantial evidence, this court must weigh and evaluate the credibility of the evidence. *Parents Protecting Children v. Korleski,* 10th Dist. No. 09AP–48, 2009-Ohio-4549, 2009 WL 2783954, ¶ 10; *Spencer* at ¶ 9; *Stark–Tuscarawas–Wayne Joint Solid Waste Mgt. Dist.* at ¶ 60. However, in so doing, we must recognize that administrative bodies consist of members with special expertise, and we must respect that expertise. *Parents Protecting Children* at ¶ 10; *Spencer* at ¶ 9; *Stark–Tuscarawas–Wayne Joint Solid Waste Mgt. Dist.* at ¶ 60. Consequently, this court affords due deference to the ERAC's resolution of evidentiary conflicts. *Parents Protecting Children* at ¶ 10; *Spencer* at ¶ 9; *Stark–Tuscarawas–Wayne Solid Waste Mgt. Dist.* at ¶ 60.

{¶ 21} Here, we must determine whether reliable, probative, and substantial evidence supports the ERAC's decision that Helms's permit-to-install application failed to provide sufficient information to determine whether the constructed wetland satisfied the criteria set forth in Ohio Adm.Code 3745–42–04(A). Pursuant to that regulation:

The director shall issue a permit to install * * * on the basis of the information appearing in the application or information gathered by or furnished to the Ohio environmental protection agency, or both, if he determines that the installation * * * of the disposal system * * * will:

(1) Not prevent or interfere with the attainment or maintenance of applicable water quality standards contained in Chapter 3745–1 of the Administrative Code;

(2) Not result in a violation of any applicable laws; and

(3) Employ the best available technology.

{¶ 22} At the adjudicatory hearing, the director presented two witnesses: Bennage and Elizabeth Bailik, a registered professional engineer with the OEPA's Division of Surface Water. Bailik testified that a properly designed constructed wetland is like a bathtub, confining the wastewater to its parameters and prohibiting all vertical and horizontal flow, except through inlet and outlet pipes. Typically, wastewater enters the "bathtub" through an inlet pipe, which is connected to a manifold pipe that runs perpendicular to the inlet pipe. From the manifold pipe, header laterals spaced equidistantly from each other extend perpendicular to the manifold pipe. The header laterals distribute wastewater evenly throughout the wetland and prevent the wastewater from short circuiting.

{¶ 23} A liner must cover the bottom and the sides of the "bathtub." The liner must be sufficiently impermeable so that no water escapes the wetland and no groundwater enters the wetland. A layer of media, normally gravel and sand, sits above the liner. The media serves multiple purposes: (1) it slows the flow of the wastewater through the wetland, maximizing the treatment; (2) it captures

some of the larger solids in the wastewater; and (3) it acts as a host for microbes that digest some of the pollutants in the wastewater. Along with the media, the plants in the wetland also remove pollutants when they take up wastewater through their root systems.

{¶ 24} According to Bailik, a designer of a constructed wetland must determine whether the wastewater will flow through the wetland at a rate that ensures sufficient reduction of pollutants. In an oversized wetland, the flow will be too low, causing the plants and sand-dwelling microbes to die from lack of water. In an undersized wetland, the flow will be too fast, causing wastewater to exit before receiving effective treatment. Numerous factors impact the design flow, including the length, width, and depth of the wetland; the hydraulic gradient; the porosity and coefficient of hydraulic conductivity of the media; the amount of water flowing into the wetland; and the amount of water flowing out of the wetland.

{¶ 25} Both Bailik and Bennage testified that Helms's permit-to-install application did not contain enough information to determine whether the proposed constructed wetland was capable of treating wastewater. The application did not indicate the amount of pollutants that the wastewater would contain when it entered the wetland, nor did the application incorporate calculations to quantify the degree to which the wetland would reduce those pollutants. Although the plans for the constructed wetland stated the dimensions of the wetland, the application did not include any calculations demonstrating that the wetland would function appropriately at the chosen size. Moreover, the application did not specify the permeability of the liner, the porosity and coefficient of hydraulic conductivity of the media, the numbers of each type of plant Helms intended to include in the wetland, or the different uptake rates for the plants. All this information impacts the calculation of the flow of the wastewater through the wetland, and without it, no one can determine whether the flow would be sufficient to accomplish treatment. Finally, the plans for the constructed wetland did not show an interior piping system. Due to the omission of this design feature, Bennage could not ascertain whether the wastewater would be evenly distributed throughout the wetland so that the entirety of the wetland provided treatment.

{¶ 26} After enumerating all the deficiencies in Helms's permit-to-install application, both Bennage and Bailik testified that the application did not contain sufficient information for them to determine whether the constructed wetland could provide sufficient tertiary treatment. Because of the inadequacies in the application, neither witness could conclude that the proposed project satisfied Ohio Adm.Code 3745–42–04(A) criteria.

{¶ 27} In response to this evidence, Helms contends that his April 2004 supplement to his application supplied the design calculations and specifications omitted from the application. Helms also points to evidence from two of his witnesses: Jensen and Cynthia Paschke, an environmental biologist that Helms hired to delineate the existing wetland. Jensen testified that the proposed project incorporated the best available technology and that the CountryView wetlands would reduce the amount of pollution in the wastewater. Jensen, however, admitted that he did not perform, much less reproduce in the application, the design calculations necessary to demonstrate that the CountryView wetlands would actually reduce the pollutants in the wastewater to an acceptable level before discharge. Paschke only stated that wetlands in general are effective in treating wastewater.

■ {¶ 28} After reviewing the totality of the hearing record, we find that reliable, probative, and substantial evidence supports the ERAC's determination that Helms did not provide sufficient information for the director to conclude that the application met the Ohio Adm.Code 3745–42–04(A) criteria. Bennage and Bailik testified specifically and credibly regarding the application's deficiencies and how those deficiencies negated their ability to determine whether the proposed project would satisfy the Ohio Adm.Code 3745–42–04(A) criteria. Moreover, none of the information contained in the April 2004 supplement dispelled Bennage's earlier negative assessment of the application. Although the record contains overwhelming evidence that wetlands can treat wastewater, it does not contain reliable, probative, and substantial evidence proving that the constructed wetland would effectively provide tertiary treatment for Country-View's wastewater. Accordingly, we overrule Helms's third assignment of error.

{¶ 29} Helms's first and second assignments of error relate to the existing wetland. Helms argues that the existing wetland cells do not qualify as "waters of the state" but instead constitute private waters that he can use to treat wastewater. We do not need to consider this argument. If, as Helms asserts, his proposal for tertiary treatment required the wastewater to flow through the constructed wetland *and* the existing wetland, then approval of his application hinged on his ability to prove that both wetlands would function appropriately. As we concluded above, Helms failed to produce enough evidence to establish that the constructed wetland would work. Consequently, given our ruling on Helms's third assignment of error, the first two assignments of error are moot.

{¶ 30} For the foregoing reasons, we overrule the third assignment of error and find the first and second assignments of error moot. Consequently, we affirm the final order of the Environmental Review Appeals Commission.

Order affirmed.

SADLER and CONNOR, JJ., concur.