OPINION
{¶ 1} Appellants, Tube City, Inc. ("TCI"), and its wholly owned subsidiary, Tube City Olympic of Ohio, Inc. ("TCOO"), appeal from the March 5, 2003 findings of fact, conclusions of law, and final order of the Environmental Review Appeals Commission ("ERAC") that affirmed the actions of the Director of the Ohio Environmental Protection Agency ("the director") with respect to Permits to Install ("PTI") Nos. 06-06131 and 02-13973.
 {¶ 2} TCOO provides "slag"[1] support services for the Wheeling Pittsburgh Steel Corporation's integrated iron and steel mill, located in Mingo Junction, Ohio. At the integrated mill in Mingo Junction, steel is manufactured in a basic oxygen furnace ("BOF"), using molten iron produced in a blast furnace. The molten BOF slag is "tapped" directly into a slag pot, which is below the BOF vessel. (Vol. I, Tr. 58.) TCI, through its Olympic Mill Services Division, provides slag support services for the North Star Steel Corporation's steel mill located in Youngstown, Ohio. At this "mini-mill," scrap metal is "fed" into an electric arc furnace ("EAF"), which melts the scrap metal. (Vol. I, Tr. 90-91.) Just as in the integrated mill, the molten slag is "tapped" into a slag pot. Ultimately, in both processes, the slag is transported and dumped into a pit for cooling. (See appellants' exhibits 2 and 7; Vol. I, Tr. 59, 92.)
 {¶ 3} As stated above, appellants appeal from an order of ERAC. ERAC is composed of three members, each of whom "shall have extensive experience in pollution control and abatement technology, ecology, public health, environmental law, economics of natural resource development, or related fields." R.C.3745.02. This court, in Perrysburg v. Schregardus (Nov. 13, 2001), Franklin App. No. 00AP-1403, stated "the General Assembly created administrative bodies to facilitate certain areas of the law by placing the administration of those areas before boards or commissions composed of individuals who possess special expertise."
 {¶ 4} On May 15 and 16, 2002, ERAC conducted a de novo hearing as to the consolidated appeals regarding the PTIs at issue in this case.[2] The proceedings before ERAC resulted from the consolidation of ERAC case Nos. 994681, 994700, and 994963, which were filed by TCI and TCOO pursuant to R.C.3745.04. ERAC case No. 994681 concerned the director's issuance of PTI No. 17-1668 to TCOO for its BOF slag-dumping operation in Mingo Junction, Ohio. At the ERAC hearing, appellants moved to dismiss that appeal as moot, upon the condition that it be without prejudice to challenge the emission factor[3] that was at issue in ERAC case Nos. 994700 and 994963. ERAC case No. 994681 was accordingly dismissed.
 {¶ 5} ERAC case No. 994700 concerned the director's issuance of PTI No. 06-06131, which essentially replaced PTI No. 17-1668, to TCOO. This PTI authorized TCOO to relocate the slag-dumping operation at the Mingo Junction facility. This PTI utilized the same emission factor that was used in PTI No. 17-1668 to calculate maximum annual emission of particulate matter for the dumping of molten slag.
 {¶ 6} ERAC case No. 994963 concerned the director's issuance of PTI No. 02-13973 to TCI to install an EAF slag-dumping operation at the Youngstown facility. This PTI also utilized the same emission factor that was used in PTI Nos. 17-1668 and 06-06131. In all three PTIs, the director selected an emission factor of 0.057 pounds of particulate emissions per ton of slag dumped.
 {¶ 7} In the case at bar, appellants contest the emission factor that was used, in the respective PTIs, to calculate the emissions from the dumping of molten slag. In TCOO's application for a PTI, TCOO submitted that 0.019 pounds of particulate emissions per ton of slag dumped is the emission factor for the dumping of BOF molten slag. (Vol. I, Tr. 77; appellant's exhibit 3.) The permit application contained information as to how TCOO reached the emission factor of 0.019 pounds per ton for BOF molten slag dumping. Appellants' exhibit 3. TCOO's calculation was based on the emission factor of "hot metal transfer at source" contained within "AP-42, Table 12.5-1." Id. According to that table, "hot metal transfer at source" has an emission factor of 0.19 pounds per ton. TCOO assumed that "Molten Slag Transfer will produce only 10% of the Hot Metal Transfer at Source emissions," and then determined that the emission factor for molten slag transfer should be 0.019 pounds per ton. Id. In other words, TCOO multiplied the published "AP-42" emission factor of hot metal transfer, 0.19 pounds per ton, by 10 percent (or .10) to reach an emission factor for molten slag dumping, 0.019 pounds per ton. Wheeling Pittsburg Steel Corporation engineer Harold Strohmeyer suggested this emission factor for BOF molten slag dumping. (Vol. I, Tr. 131.) Mr. Strohmeyer did not testify at the ERAC hearing. There is no evidence in the record as to how TCOO reached the assumption that "Molten Slag Transfer will produce only 10% of the Hot Metal Transfer at Source emissions." (See appellants' exhibit 3.)
 {¶ 8} In December 1999, the director issued PTI No. 17-1668 for the BOF molten slag operation. (See appellants' exhibit 4.) This permit used an emission factor of 0.057 pounds of particulate emissions per ton of material processed for molten BOF slag dumping. Id. According to this permit, the emission factor was based on observations of molten slag and molten metal pouring, and the estimation that the BOF slag-dumping operation emits 30 percent of the particulate matter emitted by hot metal transfer at source, which has an emission factor of 0.19 pounds per ton. See id, referring to "AP-42, Table 12.5-1." Thus, PTI No. 17-1668, which was issued to TCOO, contained a different emission factor for BOF molten slag than that contained in TCOO's permit application (0.057 pounds per ton versus 0.019 pounds per ton).[4] (Compare appellants' exhibit 3 with appellants' exhibit 4.)
 {¶ 9} Witnesses for both parties testified that it is preferable to establish an emission factor by using actual test data for the emissions rather than deriving the emission factor another way. (Vol. I, Tr. 170; Vol. II, Tr. 87, 190.) In this case, the parties were unable to find test data of the actual emissions of particulate matter from the dumping of molten slag. (Vol. I, Tr. 119-120, 142; Vol. II, Tr. 52, 96-97, 247.) Testing the actual emissions in this case could cost approximately $200,000 to $250,000, given the size of the equipment used in the molten slag-dumping operation. (Vol. I, Tr. 108-109, 171-172; Vol. II, Tr. 229-234.) Furthermore, the United States Environmental Protection Agency's (U.S. EPA) published collection of emission factors for various air pollutants, known as "AP-42," contains no emission factor for the pouring of molten slag that is produced in the steel-making process. AP-42 is commonly used as a source for emission factors. (Vol. II, Tr. 12.)
 {¶ 10} Michael Yandrich, an engineer for the Ohio EPA, testified as to the methodology used to derive the emission factor for molten slag dumping that was contained in the PTIs that are the subject of this appeal. Based on Mr. Yandrich's previous observations of slag dumping, he viewed the 0.019 pounds per ton emission rate for molten slag dumping, contained within TCOO's PTI application, as a "very low number." (Vol. II, Tr. 95-96.)
 {¶ 11} Mr. Yandrich observed the pouring of molten iron from an indoor blast furnace at the Mingo Junction facility. He observed "heavy emissions coming off the source" and determined that the opacity was "about a hundred percent, about as heavy as it could get." (Vol. II, Tr. 99-100.) Mr. Yandrich, who was certified to take USEPA-approved "Method 9" opacity readings,[5] did not use that method to make opacity readings in this case. Mr. Yandrich testified that he did not use Method 9 to estimate emissions in this case because it requires opacity observations over a period of three minutes, and the pouring of molten iron took "probably five seconds." Id. Also, a witness for appellants testified that Method 9 could not be followed for a number of reasons, including the fact that the hot metal transfer is conducted indoors. (Vol. I, Tr. 225.)
 {¶ 12} Mr. Yandrich arrived at an emission factor based on his observations of the molten slag-dumping process. He observed 30 percent opacity at the molten slag-dumping site. Mr. Yandrich did not base this observation on a Method 9 test but on "a simplified version of comparing length of pour, plume opacity and plume color." (See appellants' exhibit 15.) In other words, he compared "instantaneous opacities for steel dumping * * * and slag dumping, taking into account [his] certification for conducting Method 9 opacity observations." Id. According to Mr. Yandrich, it was valid to use the hot metal transfer emission factor to calculate the appropriate emission factor for slag. Mr. Yandrich noted that the hot metal transfer emission factor "was proposed for use by Olympic Mill Services at the [apparent recommendation] of Harold Strohmeyer." (Vol. II, Tr. 114.)
 {¶ 13} Thus, instead of finding that the molten slag transfer produces only 10 percent of the hot metal transfer at source emissions, Mr. Yandrich determined that 30 percent was a more accurate percentage of emissions. (Vol. II, Tr. 110-111.) Using the 30 percent finding, Mr. Yandrich calculated the emission factor for the dumping of molten slag that is found in appellants' PTIs (30 percent, or 0.30, multiplied by 0.19 [the AP-42 emission factor for hot metal transfer at source] equals 0.057 pounds of particulate matter emissions per ton of slag dumped). (See appellants' exhibit 15.) Mr. Yandrich also testified that there is not one "most representative" emission factor for the dumping of BOF or EAF slag, and the only way to determine the actual particulate matter emissions from slag dumping would be by testing. (Vol. II, Tr. 127-128.) Moreover, Mr. Yandrich acknowledged that he had used his best professional judgment in calculating the emission factor that appeared in appellants' PTIs. (Vol. II, Tr. 128.)
 {¶ 14} Michael E. Hopkins, manager of the Ohio EPA Air Program, testified as to whether 0.057 pounds per ton is an appropriate emission factor in this case by stating, "I think it's an appropriate emission factor to use but the reliability of it versus any other factor that's available, I don't have a lot of confidence in any of the factors that are available." (Vol. II, Tr. 196.) He further stated that "[t]he only real way of knowing [what this source would emit] is by specific testing of this kind of operation." (Vol. II, Tr. 197-198.)
 {¶ 15} The following colloquy occurred when appellants' counsel cross-examined Mr. Hopkins:
Q. [I]s it valid scientifically to do what I described: To take the emission factor, to observe the opacity of a source of particulate emissions, fugitive emissions, that has a published mass emission rate, and then observe the opacity of an entirely different source without a published emission rate, determine that the source without the published emission rate had half the opacity, had half the visible emissions, of the source with the mass emission rate. And then multiply the published emission rate by one-half and come up with a valid result[?]
A. I think it is a valid method of making that estimation.
(Vol. II, Tr. 208-209.)
 {¶ 16} When asked if said method was accurate, Mr. Hopkins testified that he did not know how accurate the method would be in a particular case. (Vol. II, Tr. 209.)
 {¶ 17} Regarding the issue of determining emission factors, the following colloquy took place at the hearing between appellee's counsel and Charles Taylor, a stipulated expert for appellants from GT Environmental, Inc.:
Q. * * * So in your expert opinion, it's not the methodology that's important, it's the range; correct?
A. * * * it depends on the circumstance. There's situations where there's a defined methodology. It's clearly the methodology of choice. In that case, that's the methodology to use. Okay?
Q. Is there one in this case?
A. And the answer to that is no, there's not a defined methodology which is clearly the methodology of choice which any experienced or trained air permit application preparer or air permit application reviewer would gravitate to a common number. That just doesn't exist in this case.
(Vol. I, Tr. 191-192.)
 {¶ 18} When questioned about the validity of the methodology used in this case, Mr. Taylor testified as follows:
* * * At the time I gave my deposition, I thought that the methodology employed was a judgment of how mass emissions were different from just an observation of the activities. I now understand that the methodology actually was based on some attempt at making visible emission readings and then comparing changes in visible emission readings and assuming that they were directly related to changes in mass emissions, which I feel is an invalid approach.
(Vol. I, Tr. 193.)
 {¶ 19} Mr. Taylor presented testimony as to multiple emission factors, which he thought were "appropriate for estimated emissions from BOF slag dumping." (Vol. I, Tr. 160.) He testified that, when making an emission factor analysis, he "typically looked to a number where different sources might coalesce around that number and exclude outliers whether they're very low or very, very high." Id.
 {¶ 20} Appellants' expert witness, Fred Hall, testified that it would be appropriate to use an equation contained in Section 13.2.4 of AP-42 to calculate the emission factor for molten slag dumping. (Vol. II, Tr. 58-59; see, also, appellee's exhibit B.) When appellee's counsel questioned Mr. Hall as to whether this emission factor was the only appropriate factor in this case, Mr. Hall responded as follows: "No, I don't feel that it's the only emission factor. I mean, there's other emission factors in AP-42 based on dry slag dumping not based on that equation, or in some cases, it is based on an equation that would be just as appropriate." (Vol. II, Tr. 58.) However, when appellants' counsel questioned Mr. Hall as to whether, "among all of the valid approaches that are there," would he include the approach used by the director in this case, Mr. Hall responded that he did not think that the director's approach was appropriate or valid. (Vol. II, Tr. 71-72.)
 {¶ 21} On March 5, 2003, ERAC issued its findings of fact, conclusions of law, and final order. ERAC concluded that the director acted lawfully and reasonably in issuing PTI No. 06-06131 to TCOO and PTI No. 02-13973 to TCI, and thereby affirmed the director's actions. Appellants appeal from this order and have set forth the following assignments of error:
ASSIGNMENT OF ERROR NUMBER ONE:
The decision of the erac affirming the director's choice of an emission factor of 0.057 pounds of particulate emissions per ton of molton slag dumped is not supported by reliable, probative and substantial evidence, and must be reversed by this court.
ASSIGNMENT OF ERROR NUMBER TWO:
Given the reliable, substantial and probative evidence in the record supporting the 0.019 emission factor proposed by appellants, the decision of the erac affirming the director's chosen emission factor constitutes prejudicial and reversible error.
 {¶ 22} By their first assignment of error, appellants assert that ERAC's decision was not supported by reliable, probative, and substantial evidence. The director's selection of the emission factor of 0.057 for molten slag dumping, which is applied in the PTIs at issue, is at the core of this appeal. Appellants specifically argue that "the decision of the ERAC to affirm the Director's choice of a 0.057 pounds of particulate emissions per ton of slag dumped emission factor was not supported by reliable, probative, and substantial evidence as that term is used in Revised Code § 3745.06." (Appellants' brief at 15.) We note that while ERAC did affirm the actions of the director with respect to PTI Nos. 06-06131 and 02-13973, ERAC did not conclude that the emission factor for the dumping of molten slag should be 0.057 pounds of particulate emissions per ton of product produced. In other words, ERAC's review of the director's actions is limited, as discussed below.
 {¶ 23} ERAC's review of the actions of the director is limited to considering whether the director's actions were unreasonable or unlawful, in view of the evidence presented at the de novo hearing; it may not substitute its judgment for that of the director as to factual issues. CECOS Internatl., Inc. v.Shank (1992), 79 Ohio App.3d 1, 6; see R.C. 3745.05. As noted in ERAC's March 5, 2003 decision, "the statutory duty of review upon [ERAC] is a determination of whether the Appellee Director's actions in issuing PTI number 06-06131 to Appellant TCOO and PTI number 02-13973 to Appellant TCI were unlawful or unreasonable." "Unlawful" means that which is not in accordance with law.Citizens Committee to Preserve Lake Logan v. Williams (1977),56 Ohio App.2d 61, 70. "Unreasonable" means that which is not in accordance with reason, or that which has no factual foundation. Id. "It is only where the board can properly find from the evidence that there is no valid factual foundation for the Director's action that such action can be found to be unreasonable. Accordingly, the ultimate factual issue to be determined by the board upon the de novo hearing is whether there is a valid factual foundation for the Director's action and not whether the Director's action is the best or most appropriate action, nor whether the board would have taken the same action." Id. Thus, in this case, ERAC did not make a finding as to whether the director's use of a 0.057 pounds per ton emission factor for molten slag dumping was correct or even the most accurate or appropriate number. Instead, ERAC concluded, in view of the evidence presented at the de novo hearing, that the director acted lawfully and reasonably in issuing PTI No. 06-06131 to TCOO and PTI No. 02-13973 to TCI, and thereby affirmed the director's actions.
 {¶ 24} The standard for this court's review of appeals from orders of ERAC are governed by R.C. 3745.06, which provides, in pertinent part, as follows:
Any party adversely affected by an order of the environmental review appeals commission may appeal to the court of appeals of Franklin county, or, if the appeal arises from an alleged violation of a law or regulation, to the court of appeals of the district in which the violation was alleged to have occurred. * * *
* * *
The court shall affirm the order complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it shall reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law. * * *
Thus, we must determine whether ERAC's order, which determined the reasonableness and lawfulness of the director's decision, was supported by reliable, probative, and substantial evidence and in accordance with law. Because appellants have not argued that ERAC's decision was not in accordance with law, the issue in this appeal is whether said decision was supported by reliable, probative, and substantial evidence. For the following reasons, we hold that the decision of ERAC was supported by reliable, probative, and substantial evidence.
 {¶ 25} This court has previously discussed the meaning of the terms reliable, probative, and substantial. "Reliable evidence is evidence which can be trusted. In order for evidence to be reliable, there must be a reasonable probability that it is true. Probative evidence is evidence which tends to prove the issue in question, while substantial evidence is evidence which carries weight, or evidence which has importance and value."Perrysburg, supra, citing Our Place, Inc. v. Ohio LiquorControl Comm. (1992), 63 Ohio St.3d 570, 571.
 {¶ 26} In our determination of whether ERAC's decision was supported by the "requisite quantum of evidence," we must weigh and evaluate the credibility of the evidence presented to ERAC.Perrysburg, citing Univ. of Cincinnati v. Conrad (1980),63 Ohio St.2d 108; Andrews v. Bd. of Liquor Control (1955),164 Ohio St. 275. This process inevitably involves a consideration of the evidence and, to a limited extent, would permit a substitution of judgment by the reviewing court. Perrysburg, citing Andrews. However, this court should give due deference to the administrative interpretation of rules and regulations as well as its resolution of evidentiary conflicts. Perrysburg, citing Univ. of Cincinnati. Moreover, this court has previously stated that in hearings before the Environmental Board of Review (the predecessor to ERAC), there is no requirement that the admission of evidence comport with the Ohio Rules of Evidence.Citizens to Protect the Environment, Inc. v. Universal Disposal,Inc. (Nov. 29, 1988), Franklin App. No. 87AP-815; see OrangeCity School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision
(1996), 74 Ohio St.3d 415, 417 (stating that "Evid.R. 101(A) does not mention administrative agencies as forums to which the Rules of Evidence apply.") Conversely, ERAC may not abuse its discretion in admitting evidence, weighing it, and granting credibility to testimony. See id.
 {¶ 27} In the case at bar, ERAC determined whether it was unreasonable or unlawful for the director to select the emission factor of 0.057 for the dumping of molten slag. ERAC was not evaluating whether 0.057 pounds per ton was the most accurate or appropriate emission factor in the respective permits for slag dumping, but was determining whether the director's decision was reasonable and lawful, given the evidence presented at the de novo hearing. Ultimately, ERAC had to resolve whether the director's application of 0.057 had a valid factual basis, in view of testimony regarding Mr. Yandrich's implemented methodology. Thus, we must determine whether reliable, probative, and substantial evidence supported ERAC's determination that it was not unreasonable or unlawful for the director to arrive at the emission factor of 0.057 pounds per ton by using the implemented methodology.
 {¶ 28} Ohio Adm. Code Chapter 3745-31 sets forth PTI regulations that govern "new sources" of air pollution. Under Ohio Adm. Code 3745-31-02(A), "[e]xcept as provided in rule3745-31-03 of the Administrative Code, no person shall cause, permit, or allow the installation of a new source of air pollutants * * * or cause, permit, or allow the modification of an air contaminant source * * * without first obtaining a permit to install from the director." Pursuant to Ohio Adm. Code3745-31-05, when the director issues a PTI, he does so "on the basis of the information appearing in the application, or information gathered by or furnished to the Ohio environmental protection agency, or both[.]" Furthermore, Ohio Adm. Code3745-31-05 provides that "[t]he director may impose such special terms and conditions as are appropriate or necessary to ensure compliance with the applicable laws and to ensure adequate protection of environmental quality." We agree with ERAC that the director's actions were lawful because the disputed emission factor contained in the PTIs had its basis in information gathered by the Ohio EPA.
 {¶ 29} Appellants strenuously argue that the director erroneously based the molten slag-dumping emission factor on methodology that is "scientifically indefensible." Appellants assert that "even the Director's witnesses conceded that." (Appellants' brief at 22.) Certainly, there was evidence presented at the hearing that called into question the methodology used by appellee to arrive at the 0.057 emission factor, as well as evidence that suggested alternative methods for deriving an emission factor. Nonetheless, evidence also existed that supported its validity and the reasonableness of the director in using said methodology.
 {¶ 30} Mr. Yandrich provided credible, detailed testimony as to how he arrived at the 0.057 emission factor. He testified that he thought his methodology was appropriate given the situation. Testimony at the hearing indicated that it is preferable to establish an emission factor by using actual test data for the emissions, but in this case the parties were unable to find test data of the actual emissions of particulate matter from the dumping of molten slag. Additionally, testimony indicated that AP-42, which is commonly used as a source for emission factors, contains no emission factor for the pouring of molten slag that is produced in the steel-making process.
 {¶ 31} Mr. Hopkins, a manager with the Ohio EPA Air Program and stipulated expert in the development of best available technology and PTIs, testified that Mr. Yandrich's approach to calculating the emission factor for molten slag dumping was a valid method of making that estimation, but its accuracy was uncertain. (Vol. II, Tr. 209.) Mr. Hopkins further testified that he thought the 0.057 pounds per ton emission factor was appropriate to use in this case, even though he did not have confidence in its reliability. Id.
 {¶ 32} Although there is testimony in the record that the disputed emission factor lacked validity and that other emission factors would have been appropriate, there is also testimony affirming the disputed emission factor's validity and the appropriateness of its use, given the particular facts in this case. In other words, the record contains the "requisite quantum of evidence" supporting ERAC's finding that the director's actions were reasonable.
 {¶ 33} Therefore, in view of the evidence presented at the de novo hearing before ERAC, we conclude that there was reliable, probative, and substantial evidence to support ERAC's finding that the director's actions were reasonable and lawful. Accordingly, appellants' first assignment of error is overruled.
 {¶ 34} In their second assignment of error, appellants argue that reliable, probative, and substantial evidence supports a 0.019 pounds per ton molten slag emission factor, and thus, the director's decision should be reversed and the PTIs should be modified to include a 0.019 emission factor instead of the 0.057 emission factor used by the director.
 {¶ 35} Appellants assert "that the record contains reliable, probative and substantial evidence supporting the 0.019 pounds of particulate emissions per ton of molten slag dumped proposed by Appellants." (Appellants' brief at 20.) Although it may be true that the record contains reliable, probative, and substantial evidence to support a 0.019 pounds per ton molten slag emission factor, the existence of such evidence is not dispositive as to whether we should reverse ERAC's decision as not being supported by reliable, probative, and substantial evidence. Pursuant to R.C. 3745.06, this court must affirm an order of ERAC if this court finds that it is supported by reliable, probative, and substantial evidence. If this court does not make that finding, then this court may "reverse, vacate, or modify the order, or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C.3745.06. Thus, even though the record contains evidence supporting a 0.019 emission factor for molten slag dumping, reliable, probative, and substantial evidence supports ERAC's order. Accordingly, we overrule appellants' second assignment of error.
 {¶ 36} For the foregoing reasons, appellants' two assignments of error are overruled, and the order of the Environmental Review Appeals Commission is hereby affirmed.
Order affirmed.
Bryant and Watson, JJ., concur.
[1] "Slag" is a byproduct in the steel-making process and consists primarily of impurities. Slag rises to the surface of vessels containing molten metal.
[2] The transcript of the proceedings before ERAC contains two volumes. We note that pages 104 and 133 are missing from Volume I of this transcript.
[3] An "emission factor" refers to the quantity of air pollution, in terms of pounds of air pollutant per ton of product produced, from a particular air contaminant source. Emission factors are used to determine annual mass rates of emission in terms of tons per year.
[4] There was testimony at the ERAC hearing that the higher emission factor creates adverse federal regulation implications for appellants.
[5] Mr. Yandrich explained the Method 9 certification process as requiring, among other things, a few hours of classroom instruction in which the methodology and the history behind reading opacity are described. (Vol. II, Tr. 101.)